JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

International Brotherhood of Electrical Workers Local 614, AFL-CIO, et al.

**DEFENDANTS**

PECO Energy Company

**(b)** County of Residence of First Listed Plaintiff   **Delaware County**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Charles T. Joyce, Esq. Spear Wilderman, P.C., 230 S. Broad St., Suite 1650, Philadelphia, PA 19102, (215) 732-0101

Attorneys *(If Known)*
Mary Catherine Gordon, Esq., 2301 Market St., S-23-1, Philadelphia, PA 19103 (215) 841-4255

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☒ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185

Brief description of cause:
Violation of contract between an employer and a labor organization

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Preliminary Injunction

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
11/9/2023

SIGNATURE OF ATTORNEY OF RECORD
/s/Charles T. Joyce

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

05/2023

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____4613 West Chester Pike, Upper Level, Newtown Square, PA 19073_____

Address of Defendant: _____2301 Market Street, S23-1, Philadelphia, PA 19103_____

Place of Accident, Incident or Transaction: _____N/A_____

---

*RELATED CASE IF ANY:*
Case Number:_____ Judge:_____ Date Terminated_____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit Pending or within one year previously terminated action in this court?    Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier Numbered case pending or within one year previously terminated action of this court?    Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se case filed by the same individual?    Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is **not** related to any now pending or within one year previously terminated action in this court except as note above.

DATE:  11/9/2023            /s/Charles T. Joyce            51254
                     *Attorney-at-Law (Must sign above)*        *Attorney I.D. # (if applicable)*

---

**Civil (Place a √ in one category only)**

*A.  Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☒ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. All Other Federal Question Cases. *(Please specify):*_____

*B.  Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):*_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases:  *(Please specify)*_____
  _____

---

### ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, _____Charles T. Joyce_____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2 § 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☒ Relief other than monetary damages is sought.

DATE: _____11/9/2023_____            /s/Charles T. Joyce            51254
                          *Attorney-at-Law (Sign here if applicable)*   *Attorney ID # (if applicable)*

NOTE: A trial de novo will be a jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INTERNATIONAL BROTHERHOOD OF** | : | **CIVIL ACTION** |
| **ELECTRICAL WORKERS LOCAL 614,** | : | **NO. 2:23-cv-4388** |
| **AFL-CIO,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DAMIEN DUCKREY** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JOHN KONIEWICZ** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JOSHUA KULCHINSKI** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PECO ENERGY COMPANY** | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

This is an action by the International Brotherhood of Electrical Workers Local 614, AFL-CIO ("Local 614" or "the Union) and on behalf of three (3) of Local 614's members, Damien Duckrey ("Duckrey"), John Koniewicz ("Koniewicz"), and Joshua Kulchinski ("Kulchinski") (hereinafter collectively "the individual Local 614 member plaintiffs") for a preliminary injunction pending binding labor arbitration under Section 301 of the Labor Management Relations Act, "LMRA," 29 U.S.C. § 185, against PECO Energy Company ("PECO", or "the Company"). The equity power of this Court is required because PECO is insisting that the

individual member plaintiffs, who are also PECO employees, agree to force their respective therapists to disclose confidential notes of their clinical counseling sessions as a condition of either returning the individual member plaintiffs back to work, or clearing them for full duty, even though said therapists have already advised the Company that the individual member plaintiffs are competent to fulfill all of their daily workplace duties. PECO's invasive demands are violative of the anti-discrimination provisions of the Collective Bargaining Agreement, and would wreak irreparable harm upon the individual Local 614 member plaintiffs if these demands remain in full force and effect. The Union has filed grievances under the CBA protesting PECO's actions and will advance them to binding arbitration if the Company does not relent. In the interim, Local 614 seeks a preliminary injunction to require PECO to return these employees to work without forcing them to waive their right to privacy surrounding their confidential therapy sessions, to prevent the arbitration process under the CBA from being a meaningless exercise.

**JURISDICTION**

1.      This Court has jurisdiction pursuant to Section 301 of the LMRA, 29 U.S.C. § 185(a) and 28 U.S.C. § 1331.

**VENUE**

2.      Venue is appropriate under 28 U.S.C. § 1391(b)(1) and (2).

**PARTIES**

3.      Plaintiff Local 614 is an unincorporated labor organization under the LMRA, with a business address of 4613 West Chester Pike, Upper Level, Newtown Square, Pennsylvania

19073. Local 614 represents, *inter alia*, a bargaining unit of employees of Defendant PECO, engaged in electrical distribution and maintenance work.

4.     Individual 614 Member Plaintiff Damien Duckrey is an employee of Defendant PECO, who was hired in or about September 2013, and is currently classified as a 1st Class Aerial Line Mechanic ("ALM") in the Company's Distribution System Operation ("DSO") Department.

5.     Individual 614 Member Plaintiff John Koniewicz is an employee of Defendant PECO, who was hired in April 2017, and is currently classified as a Substation Operator-Maintenance Technician 1st Class in the Company's Transmission and Substation ("T&S") Department.

6.     Individual 614 Member Plaintiff Joshua Kulchinski is an employee of Defendant PECO, who was hired in September 2022, and is currently classified as a Line School Apprentice ALM in the Company's Construction and Maintenance ("C&M") Department.

7.     Defendant PECO is an employer under the LMRA, with a business address of 2301 Market Street, S23-1, Philadelphia, Pennsylvania 19103.

## FACTS

**The Collective Bargaining Agreement Between Local 614 and PECO**

8.     At all times material to this controversy, Local 614 and PECO have been parties to a Collective Bargaining Agreement ("CBA" or "the Agreement") setting forth the terms and conditions of labor for employees who are members of the bargaining unit. (A copy of the CBA is attached hereto as Exhibit "A").

9.     Article 3.5 of the CBA provides, in pertinent part, that the "Company … shall in no way serve to discriminate against any individual with respect to compensation, terms, and

conditions of employment or otherwise affect his status as an employee because of such individual's … handicap." (*Id.*, at Article 3.5).

10.     Arbitrators routinely interpret such language to require employers to abide by the terms of the Americans with Disabilities Act, ("ADA") and the Americans with Disabilities Act Amendment Act of 2009 ("ADAAA").

11.     The ADA and the ADAAA both provide, *inter alia*, that employers are forbidden from making disability-related medical examinations or inquiries unless they are job-related and consistent with business necessity.

12.     Article 8.7 (A) of the CBA provides further that for employees with less that fifteen (15) years' service with the Company who have "work restrictions" imposed upon them by, *inter alia*, PECO's own in-house medical department, Occupational Health Services "OHS", which "prevent a regular employee from performing the essential functions of his position as determined by the Company, the employee will no longer have job protection in or reinstatement rights to his current position." (Ex. A., at Article 8.7 (A))

13.     Employees in such straits must "bid on open and available vacant positions" for which they may be qualified," and if no such position is available, "the employee will be terminated." (*Id.*).

14.     PECO is a subsidiary of Exelon Corporation, which also owns and operates utility companies that service much of the mid-Atlantic Region of the United States, including Delmarva Power and Light, which services much of Delaware and portions of Maryland, Atlantic City Electric ("ACE" ), which services South Jersey to the Atlantic Coast, Baltimore Gas and Electric Company ("BGE"), which services the entire state of Maryland, and Potomac Electric Power Company ("PEPCO") which services the District of Columbia. (See Affidavit of

4

Lawrence J. Anastasi, attached hereto as Exhibit "B," and hereinafter referred to as "Anastasi Aff.," at ¶ 16).

15.     In the event that any PECO employee loses his or her job, they are not allowed to work at any other utility Exelon owns or operates, or for any third party contractor which does any work on any Exelon property. (Anastasi Aff., at ¶ 17).

16.     The CBA contains a comprehensive "Grievance Procedure" to "establish procedures for the processing and settlement of complaints" and defines a "Grievance" as "a dispute between the Company and the Union or its members as to the interpretation, application, or compliance with" the CBA. (*Id.,* at Article X, Sections 1-2).

17.     If the parties are unable to resolve the dispute in the first three steps of the Grievance Procedure, the CBA provides for a fourth "arbitration" step, at which an impartial Arbitrator is appointed under the rules of the American Arbitration Association ("AAA") to hear and adjudicate the controversy. (*Id.,* at Step 4).

18.      This Arbitration section provides that "except for grievances involving discharge or as otherwise agreed, grievances must be scheduled and heard in arbitration in order of appeal to arbitration."  (*Id.*)

19.     As of this writing, there are at least five (5) pending grievances that have been appealed and scheduled for arbitration. (Anastasi Aff. at ¶ 31).

20.     The Grievance procedure further provides that separate grievances may not be joined in one arbitration proceeding except by mutual agreement of the parties in writing, even if the grievances involve the same issue or operative facts. (See Ex. A, at Step 4, Section 8; Anastasi Aff. at ¶ 32).

21.     Since at least 2017, whenever Local 614 has requested consolidation of grievances into a single arbitration, PECO has refused to do so. (Anastasi Aff., at ¶ 33).

**PECO Demands that its Employees use Occupational Health Services ("OHS") for all Work-Related Physicals and all Assessments of Fitness-For-Duty ("FFD")**

22.      Many of the employees of PECO who are also members of IBEW Local 614 require a Commercial Drivers' License ("CDL") to be qualified to perform their jobs.

23.     To obtain and maintain a CDL, employees must be periodically medically certified by health care providers who are certified under federal regulations to serve as "medical examiners" for this purpose. (Anastasi Aff., at ¶ 5).

24.     Unlike almost all other employers, PECO does not allow employees to use any federally certified medical examiner other than its own in-house Occupational Health Services ("OHS") (*Id.,* at ¶ 6).

25.     Additionally, when employees go out of work for any medical or behavioral reason, PECO requires them to coordinate their Short Term Disability ("STD") and/or Long Term Disability ("LTD") with OHS, and OHS alone will determine whether such employees are FFD to return to work. (*Id.,* at ¶¶ 7-8).

26.     In a considerable number of cases, OHS refuses to accept the prognosis of the employee's health care provider that the employee is FFD, and will instead require the employee to treat with another Specialist. (*Id.,* at ¶ 9).

27.     And if OHS then disagrees with the opinion and /or evaluation of the Specialist, even when the employee has been referred to the Specialist by OHS, it will then demand to review the provider's own therapeutic notes of the employee's care. (*Id.,* at ¶ 10).

**Damien Duckrey**

28.     Damien Duckrey is an ALM in PECO's Distribution System Operations Department, and works on locating "faults" in underground electric transmission and distribution systems. (See Affidavit of Damien Duckrey, attached hereto as Exhibit "C," and hereinafter referred to "Duckrey Aff."). He has less than 15 years' service with the Company, and his job requires him to maintain a CDL.  (Duckrey Aff., at ¶ 3).

29.     In November 2022, Duckrey went out on STD to deal with issues of stress he was experiencing in his personal life. (*Id.,* at ¶ 4). These issues did not include any sort of dependency on alcohol or drugs. (*Id.,* at ¶ 11).

30.     Duckrey used PECO's Employee Assistance Program ("EAP") provider, Optum, which arranged him to treat with a therapist, Dr. Huan Tang Lu. (Duckrey Aff. at ¶ 5).

31.     Dr. Lu finished his treatment of Duckrey, and upon information and belief, sent to OHS a report which cleared him to return to work without restrictions. (*Id.,* at ¶ 6).

32.     However, despite this report, OHS Manager Barbara Guenst informed Duckrey that he had to attend additional counseling for "substance abuse," even though his reason for taking leave from work had nothing to do with alcohol or drug use, and even though in his decade with PECO, he had never failed a drug or alcohol test, or had been accused of possessing, using or being "impaired" from drugs or alcohol while working. (*Id.,* at ¶ 7).

33.     When Duckrey told Dr. Lu about this development, Dr. Lu assured Duckrey that he did not see any substance or alcohol issue with him, and that he would tell OHS that he had been in intimate discussions with Duckrey during their therapy sessions, and did not believe he needed to attend a substance abuse program. (*Id.,* at ¶ 8).

34.     Regardless, OHS required Duckrey to attend a substance abuse program overseen by a provider, Greg Pryor, of Life Spring Counseling. (*Id.,* at ¶ 9).

35.     In April, 2023, Duckrey was allowed to come off of STD and return to work. However, when he contacted OHS in May to schedule his medical certification to maintain his CDL, he was told he had to go into another program, this time for alleged "alcohol abuse." (*Id.,* at ¶ 10).

36.     At the same time, he remained on modified duty:  Because OHS would allow him to get his CDL medical certification, he was not allowed to drive a PECO vehicle, nor allowed to accept call outs for overtime opportunities. (*Id.,* at ¶ 11). Although he was still able to perform all the other safety-sensitive duties of his job, the restriction of being on modified duty caused Duckrey stress and difficulty, as his co-workers and supervisors began to wonder why he remained unable to participate fully in all the essential functions of his position. (*Id.*).

37.     In June, 2023, Pryor assured Duckrey that he believed he only needed to attend six (6) Alcoholics Anonymous meetings, and that Pryor would then report back to OHS that Duckrey was fit for full duty. (*Id.,* at ¶14).

38.     Pryor also suggested that Duckrey enter into a counseling arrangement with a therapist, Richard Sockritter of CJT Behavioral Health, to commence in August, 2023 and terminate in August, 2024. (*Id.,* at 15).

39.     On or about July 20, 2023, however, Guenst told Duckrey that OHS would still not "consider" him for CDL certification, because OHS required "verification that [his] serious health condition is controlled."  (*Id.,* at ¶ 16). Guenst further insisted that OHS "will need a copy of" Duckrey's "therapy notes to confirm engagement with ongoing treatment" before she would allow him to be scheduled for a CDL physical. (*Id.*).

40.     A month earlier, to prevent his CDL medical certification from lapsing for other, non-PECO purposes, Duckrey obtained a medical certificate from a different health care provider who was also a certified medical examiner under federal law. (*Id.,* at ¶ 18).

41.     When Duckrey advised Pryor of this, he told him that he would not release personal therapy notes, but would – as he promised earlier – advise OHS that Duckrey was cleared for full duty. (*Id.,* at ¶ 17).

42.     During Duckrey's sessions with Sockritter beginning in August, 2023, he believed that he was able to be entirely candid with the therapist, as Sockritter promised that whatever was said in their sessions would remain confidential. For this reason, Duckrey felt he was greatly benefiting from this therapy. (*Id.,* at 19).

43.     On or about October 2, 2023, after attempting several times to obtain a timeline from OHS as to when he could obtain a PECO Medical Certificate to allow him to return to full duty, Duckrey emailed Guenst stating that both Pryor and Sockritter were resistant to release notes from Duckrey's therapy sessions, and Duckrey requested that OHS provide him with "procedures or documentation to gain a better understanding of why this information is necessary." (*Id.,* at ¶ 20).

44.     Duckrey also wrote: "I am genuinely striving to restore the normalcy" to his life which he felt "had been disrupted" by OHS's invasive behavior toward his therapeutic regimen. (*Id.,* at ¶ 21).

45.     Guenst did not respond. Instead, an OHS Registered Nurse, Jason Wolfe, wrote Duckrey back with a renewed demand to view the actual therapy notes kept by Sockritter in the therapy sessions he has had with Duckrey. "Once the documentation is submitted by the

therapist," Wolfe stated, "OHS can review to determine [if] it meets criteria to move forward with the process per protocol." (*Id.,* at ¶ 22).

46.    Duckrey advised Sockritter of OHS's intransigence, and Sockritter responded by telling Duckrey that he would not release his notes to any third party unless compelled to by a court of law, but that he would prepare a report of Duckrey's progress directly to Pryor, who could in turn provide that report to OHS. (*Id.*, at ¶ 23).


**John Koniewicz**

47.    John Koniewicz is a Substation Operator-Maintenance Technician 1st Class in PECO's Transmission and Substation ("T&S") Department. (See Affidavit of John Koniewicz, attached hereto as Exhibit "D" and hereinafter referred to as "Koniewicz Aff.", at ¶ 2).

48.    Koniewicz' s duties consist of opening and closing electrical circuits for dispatchers to allow work on the system, substation inspections, and maintenance, calibration, and testing of high-voltage transformers and circuit breakers. (Koniewicz Aff. at ¶ 3). An employee since 2017, he does not require to maintain a CDL to perform his duties, although less senior employees in his department are required to do so. (*Id.).*

49.    On June 11, 2023, while off duty, he was charged with a D.U.I. offense. (*Id.,* at 4).

50.    While awaiting the outcome of his case, Koniewicz was advised by his attorney to be proactive, and to voluntarily enter an impatient drug and alcohol program. Consequently, he entered the Brookdale Premier Addiction Recovery Center on June 28, 2023 to begin an impatient 31 day program there. (*Id.,* at ¶ 6).

51.     Koniewicz filed for and received STD to attend this inpatient treatment. (*Id.*, at ¶ 7).

52.     During Koniewicz' s treatment at Brookdale, he was under the care of Dr. Joseph Garbley, and received counseling from a therapist, Fred Collier. At the commencement of this counseling program, Koniewicz was assured by Collier that anything he shared with him would remain strictly confidential, unless it involved a matter of imminent danger to Koniewicz or to others. (Koniewicz Aff. at ¶ 8)

53.     On July 28, 2023, Koniewicz was released from Brookdale and cleared be the Center to return to full duty without restrictions by Dr. Douglas Coslett and by Ms. Melanie Smith, Patient Experience Manager at Brookdale. (*Id.,* at ¶ 9).

54.     Koniewicz contacted PECO immediately, seeking a return to work and an end to his STD. However, OHS insisted that he contact PECO's Employee Assistance Program ("EAP") provider, Optum, for further care. (Id.*,* at ¶ 10). Optum's Substance Abuse Professional ("SAP"), Amiee Rohrer-Kramer, told him to follow the directives of a Licensed Clinical Social Worker ("LCSW") Ann Marie Brown, who told Koniewicz that he needed to attend an Intensive Outpatient Program ("IOP"), for a period of several weeks before he could return to work. (*Id.*, at ¶ 11).

55.     Pursuant to this directive, Koniewicz began an IOP at Recovery Centers of America ("RCA"), which consisted of three, 3-hour sessions per week and an additional 1-hour session per week with LCSW Dana Marouchoc. (*Id.,* at ¶ 12).

56.     At the commencement of these sessions, Marouchoc assured Koniewicz that anything he shared with her in the course of their therapy would remain strictly confidential, unless it involved a matter of imminent danger to myself or to others. (*Id.,* at ¶ 13).

57.    On or about September 20, 2023, Koniewicz's progress in therapy was significantly advanced so he was released to return to his job at PECO without restrictions or limitations. (*Id.,* at ¶ 14).

58.    However, that same day, OHS Manager Guenst wrote to Marouchoc, stating that to release Koniewicz to full duty, RCA had to complete a physical demands/functional job analysis and provide "medical/therapy notes" for "OHS Review."  (*Id.,* at ¶ 15).

59.    A week later, September 27, 2023, Marouchoc responded, explaining to Guenst that she had been Koniewicz' s primary therapist at RCA, and that he was in the process of completing their sessions together. She advised Guenst, however, that RCA does "not provide therapy session notes to third parties due to confidentiality concerns." (*Id.,* at ¶ 16).

60.    On or about September 28, 2023, Koniewicz emailed Guenst and Marouchoc, stating that he believed, by now, there were "multiple certified facilities stating that [he was] competent physically and mentally to return to work with no restrictions." (*Id.,* at ¶ 17).

61.    One day later, Guenst replied to Koniewicz and Marouchoc, stating that OHS "needs a copy of the medical record, not correspondence, while in treatment" at RCA, and that if they were not provided by October 2, 2023, he not only would not be allowed to return to work, but that his STD would be discontinued. (*Id.*, at ¶ 18).

62.     On October 2, 2023, Koniewicz emailed Guenst and copied Marouchoc, reiterating that he had been cleared to return to work without restrictions or conditions as early as July 28, 2023, and that he had, since then, been trying to do everything that OHS directed him to do. (*Id.*, at ¶ 19).

63.    Also on October 2, Ms. Marouchoc completed PECO's "Physical Demands/Functional Job Analysis" for Koniewicz and concluded that he could "safely perform

the duties" of my position. She further wrote "John is able to return to work full-duty with no restrictions. John has been medically cleared and has been cleared by his employer to return to work. He has been compliant with all program requirements." (*Id.,* at ¶ 20)

64.     On the morning of October 3, 2023,. Guenst responded to Marouchoc, thanking her for completing the functional job analysis, but insisting that she send all "office notes/medical records" of Koniewicz' s therapy sessions at RCA. She told Marouchoc that "OHS requires a sign off by the psychiatrist with the office notes/medical records" before it would agree to return Koniewicz to work. (*Id.,* at ¶ 21).

65.      Hearing nothing further from Guenst, Koniewicz contacted Kimberly Baudek, RN, whom he was advised is Guenst's "boss" at Exelon, later that day, hoping that she could get this matter resolved so that Koniewicz could return to work. (*Id.,* at ¶ 22).

66.     Koniewicz explained to Baudek that he had voluntarily entered Brookdale Recovery as a proactive measure on advice of his attorney, that he had completed 30 days inpatient treatment there, and was cleared to return without restrictions as early as July 29th. Koniewicz further advised Baudek that upon his release, he was required to attend an eight week IOP at Recovery Treatment Centers of America, who, in turn, also released him to full duty on September 20th. (*Id.,* at ¶ 23).

67.     Also, on October 16, 2023, Megan Levan, MA, CAADC, LPC, the Outpatient Services Director at RCA, wrote to Guenst and Baudek, explaining that "[i]t is not customary and would be breaking confidentiality and HIPPA compliance to provide actual charting" of Koniewicz' care at the Recovery Center of America, but offered to "provide a letter and/or summary outlining treatment goals and objective, prognosis, dates of participation, and a general synopsis" of his "treatment stay" with RCA. (*Id.,* at ¶ 24).

68.     Shortly after this email from Ms. Levan, Baudek wrote back substantively to Koniewicz for the first time, saying that although she "understood" that he had "successfully completed the treatment program" at RCA, OHS was still requiring the "clinical office notes" taken by Koniewicz's Therapist, before PECO would allow him to return to work. She copied. Marouchoc on this correspondence as well. (*Id.,* at ¶ 25).

69.     On October 18, 2023, Baudek wrote back to Ms. Levan, copying Koniewicz. "Hi Megan," she began. "As part of the return to work process, OHS needs the clinical office notes directly to ensure that you [sic] are stable and safely able to return to your safety sensitive role for the company."  (*Id.,* at ¶ 26).

70.     On October 23, 2023, Guenst wrote Koniewicz yet again, still demanding his "medical records," *i.e.*, the notes of his Therapist Ms. Marouchoc, by the end of business October 30, 2023. (*Id.,* at ¶ 27).

71.     Koniewicz  last received a check for STD on October 27, 2023, but given Guenst's threats to remove him from STD and at the same time, forbid him from returning to work,  Koniewicz possesses a real fear that he will soon have no monies coming in at all to pay for his mortgage, bills, and medical expenses that are not covered by his insurance, unless he allows PECO to obtain the confidential therapy notes of Ms. Marouchoc and/or Mr. Collier. (*Id.,* at ¶ 29).

72.     As it is, since July of 2023, Koniewicz' s monthly compensation has been cut drastically, even though he has been cleared to return to work as early as July 28, 2023. Thus, he has been struggling to make minimum payments on credit card balances and has had to borrow at least $2000 a month from his family and friends just to stay afloat financially. (*Id.,* at ¶ 30).

73.     The stress of wondering if he will have to release the confidential notes of his therapists to the Company in order to return to work, or even to simply remain on STD, has been intense and has affected every aspect of his life and that of his family. (*Id.,* at ¶ 30).

**Joshua Kulchinski**

74.     Joshua Kulchinski is a Line School Apprentice ALM in PECO's Construction and Maintenance (C&M) Department. (See Affidavit of Joshua Kulchinski, attached hereto as Exhibit "E," and hereinafter referred to as "Kulchinski Aff.," at ¶ 2). He has been employed by PECO only since September, 2022, and his current duties consist of assisting more senior ALMs in the new construction, maintenance and repair of overhead electrical distribution and service lines, transformers, meters, metering equipment, and related equipment. His job requires him to maintain a CDL.  (Kulchinski Aff., at ¶ 3).

75.     In August 2022, Kulchinski passed his medical certification to hold a CDL. At the time, he disclosed to OHS that he was on medication (Citalopram, for depression), and he was told that his primary health care provider, Doctor Dave Lewis, had to complete a form with details regarding Kulchinski's medication, dosage and recommendation whether he could drive on duty. (*Id.,* at ¶ 4).

76.     On or about October 23, 2022, Dr. Lewis completed this form and gave it to Kulchinski, who in turn faxed it to OHS, and he was medically certified to obtain a CDL. (*Id.,* at ¶ 5).

77.      In August, 2023, in the course of recertification for his CDL, Kulchinski was asked to again list any medications he was taking, and he again listed Citalopram. OHS required

Dr. Lewis to again fill out a form setting forth a list of Kulchinski's medications, dosage, and his recommendation as to whether Kulchinski could drive a Company Vehicle. (*Id.,* at ¶ 6).

78.     Just prior to commencing the recertification process, Dr. Lewis had prescribed an additional medication for Kulchinski (Buspirone, for anxiety). He did not fill the prescription, however, and forgot to mention it on the list of medications he was using when he completed his part of the application for recertification for his CDL. (*Id.,* at ¶ 7).

79.     When Dr. Lewis completed the form, however, he included Buspirone on the list of medications Kulchinski was prescribed. (*Id.,* at ¶ 8).

80.     Because of the discrepancy between what Kulchinski had listed as his medications and what Dr. Lewis had listed on the form, OHS's Manager Guenst told Kulchinski that she would not approve his medical re-certification for his CDL unless Dr. Lewis produced his personal notes of Kulchinski's treatment. (*Id.,* at ¶ 9).

81.     Kulchinski advised Guenst that his Buspirone prescription had never been filled, and offered to simply ask Dr. Lewis to revise his statement.  Guenst said to Kulchinski, "No, it's too late. It's already on there [the form he filled out]." "Now I cannot approve you," she warned him, unless Kulchinski told Dr. Lewis to produce his treatment notes regarding Kulchinski's care to OHS. (*Id.,* at ¶ 10).

82.     Kulchinski complained to Guenst that producing all of his doctor's confidential notes regarding his treatment felt invasive, and that he was uncomfortable doing so. Guenst responded, "well if you don't do it, then I can't approve you for the Certificate for your CDL." Then she asked Kulchinski if he had any questions, but when he began to ask her something, she abruptly cut him off and said, "I already gave you all the information. You just have to do what I said." (*Id.,* at ¶ 11).

83.     She followed up this conversation, which was over the phone, with an email to Kulchinski on August 23, 2023, reiterating this demand. (*Id.,* at ¶ 12).

84.     Kulchinski contacted Dr. Lewis, and to move the process forward, they mutually decided that he would release to Guenst his treatment notes, even though both continued to feel it was unduly invasive to do so. (*Id.,* at ¶ 13).

85.     On or about September 14th, a few days after Dr. Lewis's treatment notes were sent to Guenst, she called Kulchinski and told him that she had "a number for somebody" for him to call "and schedule a meeting." When Kulchinski asked who this person he was supposed to call was, and for what purpose he had to speak with her, Guenst said "this is for substance abuse." (*Id.,* at ¶ 14).

86.     Kulchinski was flabbergasted, and asked her, "where are you coming up with this?" She responded, "well, in your doctor's notes it says that you have three drinks a day." (*Id.,* at ¶15).

87.     Kulchinski protested that he could not recall Dr. Lewis and him ever discussing this, and that the notation she had read could have been from a long time ago. Kulchinski offered to have Dr. Lewis provide a fresh assessment of this issue, but Guenst refused and ordered Kulchinski to call a woman at Optum - the PECO's Employee Assistance Program ("EAP") - named Anne Doan. (*Id.,* at ¶16).

88.     At the same time, Guenst put Kulchinski on "modified duty." He was not allowed to drive a PECO vehicle, nor allowed to accept call outs for overtime. This restriction made work life extremely awkward and uncomfortable for Kulchinski, as his fellow workers and more senior ALMs began to wonder why he wasn't able to fully perform the essential functions of my position. Further, as an Apprentice, his restriction also made the training Kulchinski was

supposed to be doing to advance as an ALM within the C&M Department very difficult. (*Id.,* at ¶ 17).

89.     Upon Guenst's orders, Kulchinski contacted Doan who, in turn, arranged for him to have a video consultation with a substance abuse professional named Vincent Rogers. (*Id.,* at ¶ 19).

90.     During the consultation, Rogers was puzzled as to why he had to meet with Kulchinski, and told him, "you know Josh, I don't believe that you have a substance abuse problem or that you're an alcoholic." (*Id.,* at ¶ 20).

91.     A few days after this consultation, however,. Doan contacted Kulchinski again and directed him to attend ten (10) sessions with a Licensed Clinical Social Worker (LCSW") and Counselor named Merle Mullins. It was Kulchinski's understanding that after he completed these sessions, the EAP and OHS would approve him to return to full duty with the Company. (*Id.,* at ¶ 21).

92.     When Kulchinski began his sessions with Mr. Mullins, he had Kulchinski sign a "General Counseling Agreement," which stated, among other things, that "the disclosures "he made to Mullins "while working with him are private and protected." The Agreement further said that what was discussed in their sessions would remain confidential, and that Mullins would not disclose what was said or what he captured in his notes unless he believed Kulchinski was "in serious and immediate risk of harming" himself or someone else; whether Kulchinski indicated that he was involved "in the abuse of a minor child, an elderly adult, or a disabled person"; or whether Mullins was "ordered to release information by subpoena." Then, according to the law, he'd be obligated to disclose this information. (*Id.,* at ¶ 22).

93.     When Kulchinski was midway through his counseling sessions with Mullins, Guenst telephoned him and said that Kulchinski had to identify who his therapist was, and that she needed to see the therapist's personal notes regarding their therapy sessions. She followed up this phone call with an email to Kulchinski on October 12, 2023 that repeated these demands. (*Id.,* at ¶ 23).

94.     In the email, Guenst stated that "OHS will need a copy of the office notes from your therapist," adding that this information "is required as part of the return to full duty process." (*Id.,* at ¶ 24).

95.     As Guenst had now informed Kulchinski, first over the phone and then in writing, that he would not be returned to full duty until Mullins sent his notes about Kulchinski's therapy sessions to her, Kulchinski alerted Mullins about this at their next session. Mullins told Kulchinski that he had been in practice since 1982, and he had never had anybody ask him for such confidential information, and that he had never given out his personal therapy notes to anyone before. (*Id.,* at ¶ 25).

96.     Mullins also said that he did not feel comfortable, either for himself or for Kulchinski, in sending Guenst his treatment notes, but offered to provide a narrowly tailored written summary of their discussions that he believed should fulfill any valid need for more documentation. (*Id.,* at ¶ 26).

97.     As of this filing, Mullins has not yet supplied Guenst with his written summary of Kulchinski's progress, but regardless, Kulchinski possesses no confidence that Guenst will be satisfied with anything other than possession of his Counselor's personal notes of their sessions. (*Id.,* at ¶27).

98.     Kulchinski remains on modified duty, with all the economic and psychological damage that status entails. (*Id.,* at ¶28).

99.     The stress of his not knowing whether he will have to agree to release to PECO the confidential notes of his therapists in order to return to full duty, or even to simply remain an employee of PECO, has been very severe and has negatively affected his work and family life.

**Local 614 Files Grievances on Behalf of the Individual Member Plaintiffs, and PECO Refuses the Union's Request to Consolidate and Expedite the Grievances**

100.    On or about October 26, 2023, Local 614 filed Grievances on behalf of Damien Duckrey, John Koniewicz, and Joshua Kulchinski, alleging that PECO is violating Article 3.5 of the CBA, by allowing its OHS to engage in practices that discriminate against Union members on the basis of "perceived" disability, and by forcing them, as a condition of regular employment and/or eligibility for STD, to surrender their right of privacy in the personal therapeutic notes maintained by their health care providers. (Anastasi Aff., at ¶¶ 26-27).

101.    Because of certain structural roadblocks in the Grievance and Arbitration Procedure, however, unless the Company agrees to allow these cases to proceed on a consolidated basis, and to be heard on an expedited basis, it is likely that they will not be decided by a neutral arbitrator until at least late 2024, or even early 2025. (*Id.,* at ¶¶ 29-39).

102.    On or about November 7, 2023, Local 614 Business Manager Lawerence J. Anastasi met with representatives of the Company to discuss the problems the Union has with OHS generally, and in the course of this discussion the Individual Local 614 Member Plaintiffs' Grievances were also addressed. (Anastasi Aff., at ¶ 40).

103.    Anastasi asked the PECO representatives if they would agree to move the Grievances to the "head of the list" of cases to be scheduled and heard, and agree to hear those cases in a consolidated fashion and on an expedited basis.  (Anastasi Aff., at ¶ 41).

104.    The PECO representatives refused to provide Anastasi with any assurance that it would treat the Grievances in any way other than what the CBA normally provides. (*Id.*)

## COUNT ONE
## PRELIMINARY INJUNCTION

105.    Local 614 incorporates and realleges Paragraphs 1 to 104 of the Complaint as if fully set forth therein.

106.    Federal Courts have jurisdiction to issue an injunction in a labor dispute over the terms of a collective bargaining agreement, to prevent any eventual arbitration award from being a "hollow formality" by the time the award issues.

107.    To secure such equitable relief, a labor union must essentially satisfy a five-part test:  First, it must show that the dispute is arbitrable; then, that it possesses a probability of success on the merits of the dispute; then, that the union or its members will suffer irreparable harm if the injunction is not granted; then, that the balance of hardships favors injunctive relief, and finally, that the said relief will be in the public interest.

108.    There is a "presumption of arbitrability" when the dispute at issue concerns the interpretation or application of a CBA, and an order to arbitrate a dispute will not be denied unless it may be said with positive assurance that the arbitration clause in the CBA is not susceptible of an interpretation that covers the asserted dispute.

109.    Under this standard, the Grievances involving the OHS's treatment of the individual Local 614 member plaintiffs is arbitrable.

21

110. With regard to the "likelihood of success on the merits," all Local 614 must show is that the position it is taking with regard to the Grievances "is sufficiently sound to prevent the arbitration from being a futile endeavor."

111. Local 614's position that the Company is violating Article 3.5 of the CBA by its treatment of the individual Local 614 members is sufficiently sound to prevent the eventual arbitration from being a futile endeavor, as it is based upon, *inter alia*, existing judicial precedent under the Americans with Disabilities Act and guidelines for enforcing the Act issued by the Equal Employment Opportunity Commission ("EEOC").

112. The individual Local 614 member plaintiffs will suffer irreparable harm if an injunction is not issued pending arbitration, in that they will experience an invasion of privacy, reputational harm, and the possibility of denial of adequate medical and mental health care, in addition to other losses.

113. The balance of hardships in this case favors the issuance of equitable relief:  the arbitration process and the individual Local 614 member plaintiffs' interests will be frustrated without an injunction.  On the other hand, Defendant PECO's "harm" if the Court issues an Order forbidding the OHS from demanding private and confidential therapeutic notes as a condition of employment is wholly speculative, and not borne out by the facts of this case.

114. Issuing an injunction in this case advances the public interest by promoting the use of arbitration to resolve labor disputes.

WHEREFORE, IBEW Local 614 hereby requests that its Request for a Preliminary Injunction be Granted, and that Defendant PECO and its OHS be prohibited from demanding confidential medical records from its employees as a condition of employment, that it immediately reinstates Damien Duckrey, John Koniewicz, and Joshua Kulchinksi to full employment, pending the

22

arbitration of the underlying dispute in their cases, and that Defendant PECO agree to consolidating and expediting the arbitration over these cases.

Respectfully submitted,

**SPEAR WILDERMAN, P.C.**

**BY:** _____/s/Charles T. Joyce_____
      **CHARLES T. JOYCE**
**I.D. #51254**
**Attorneys for Plaintiff IBEW Local 614**
**230 S. Broad Street, Suite 1650**
**Philadelphia, Pennsylvania 19102**
**(215) 732-0101**
**(215) 732-7790 (Fax)**

**Dated:**  November 9, 2023