**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **INTERNATIONAL BROTHERHOOD** | : | **CIVIL ACTION** |
| **OF ELECTRICAL WORKERS,** | : | |
| **LOCAL 614**, | : | **NO. 2:23-CV-4388** |
| | : | |
| **DAMIEN DUCKREY,** | : | |
| | : | |
| **JOHN KONIEWICZ**, and | : | |
| | : | |
| **JOSHUA KULCHINSKI,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **PECO ENERGY COMPANY,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 614, AFL-CIO'S
MOTION FOR PRELIMINARY INJUNCTION**

International Brotherhood of Electrical Workers, Local 614, AFL-CIO ("the Union" or

"Local 614"), on behalf of its members and co-plaintiffs Damien Duckrey ("Duckrey"), John

Koniewicz ("Koniewicz"), and Joshua Kulchinski ("Kulchinski"), seeks a Preliminary Injunction

to preserve a meaningful opportunity to arbitrate its  contractual dispute with PECO Energy

Company ("PECO" or "the Company") over the invasive, overbroad, and discriminatory

inquiries made by PECO into the confidential medical histories of Duckrey, Koniewicz, and

Kulchinski (hereinafter also referred to collectively as the "individual Local 614 member

Plaintiffs"). The Collective Bargaining Agreement ("CBA" or "the Agreement") between the

Union and the Company expressly prohibits discrimination on the basis of handicap (*i.e.*,

disability). This includes disability discrimination resulting from invasive medical exams or

inquiries. From at least the Summer of 2023 to present, PECO's Occupational Health Services department ("OHS"), which the Company has made solely responsible for conducting medical evaluations of employees and certifying that they are medically cleared to work, has been requiring employees, including individual Local 614 member Plaintiffs, to provide complete records of mental health treatment, including all notes taken during private therapy sessions, as a condition to returning them to full employment.

Defendant PECO's demands violate key tenets of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., constitute an invasion of privacy, and have already caused significant financial, emotional, and reputational harms to the individual Local 614 member Plaintiffs. On or about October 26, 2023, the Union filed grievances over the Company's actions, but any arbitration of these grievances will likely not be resolved until late 2024 or early 2025. In the meantime, employees are threatened with irreparable harm to their reputations, their privacy, and their ability to receive adequate medical treatment, which would render any eventual arbitration practically meaningless, even if the Union ultimately prevails. The Union thus seeks a preliminary injunction to halt these ongoing harms and to preserve the arbitrator's authority to grant full and complete relief to Local 614 and its members.

## I. Statement of Facts

PECO is a private utility company that provides gas and electric energy to business and residential customers throughout southeastern Pennsylvania. *See* Affidavit of Lawrence Anastasi, attached to the Complaint as Exhibit "B," and referred to hereinafter as "Anastasi Aff." at ¶ 2. The Union is party to a Collective Bargaining Agreement ("CBA") with PECO that establishes

the terms and conditions of labor for a unit of employees engaged in electrical and gas distribution and maintenance work. Anastasi Aff. ¶ 3.

For many PECO employees, a condition of employment includes being able to drive certain Company vehicles for which they must obtain and maintain a Commercial Driver's License ("CDL"). Anastasi Aff. at ¶ 5. In order to be issued a CDL, they are required to obtain a valid Medical Examiner's Certificate ("ME Certificate") which must be periodically renewed. *Id*. Although an individual seeking a CDL in Pennsylvania can obtain an ME Certificate from any qualified Medical Examiner in the Commonwealth, PECO refuses to accept any ME Certificate that is not issued by its own OHS department. Anastasi Aff. ¶ 5-6.

If an employee whose job requirements include possession of a valid CDL cannot obtain an ME Certificate through OHS, they will be placed on modified work duty or "light duty" status and will be unable to work most overtime opportunities. Anastasi Aff. ¶ at 7. Also, in the close-knit world of the PECO unionized workforce, such employees face questioning by their co-workers and supervisors, with strains a unique "bond of trust" that the workers must maintain to perform their vital and dangerous daily tasks. *Id.,* at ¶¶ 23-24.

Further, under the CBA, an employee with less than fifteen (15) years of service who remains in such duty status for longer than six months because of failure to obtain an OHS-issued ME Certificate must find a vacant position that does not require a CDL, or they will be subject to termination. Anastasi Aff., at ¶ 11. A copy of the CBA between IBEW Local 614 and PECO is attached to the Complaint as Exhibit "A." *See* Art. 8.7(A) of the CBA.

Similarly, in the case of an employee attempting to return from short-term disability ("STD") leave or from participation in PECO's Employee Assistance Program ("EAP"), OHS will require a medical evaluation and documentation to ensure that the employee is fit for duty

("FFD") before they can return to work. *See* Affidavit of John Koniewicz, attached as Exhibit "D" to Plaintiffs' Complaint and hereinafter referred to as "Koniewicz Aff," at ¶¶10-15. And, again under the CBA, if an employee with less than fifteen years of service is not cleared by OHS to return to work, they will have six months to either demonstrate fitness for duty or find a vacant position for which they are qualified. CBA Art. 8.7(A). If he or she cannot do so, they are, also, subject to termination. *Id.*

Each individual Local 614 member Plaintiff is currently on modified duty because OHS has refused to either renew their ME Certificate or, in the case of John Koniewicz, is out of work because OHS refuses to return him to duty following short-term disability leave. *See* Affidavit of Damien Duckrey, attached to the Complaint as Exhibit "C," and hereinafter referred to as "Duckrey Aff.", at ¶¶ 11, 25; Koniewicz Aff., at ¶¶ 18, 25; Affidavit of Joshua Kulchinski, attached to the Complaint as Exhibit "E", and hereinafter referred to as "Kulchinski Aff.", at ¶¶ 9, 28. The sole reason for these refusals is because OHS, through its Manager, Certified Registered Nurse Practitioner Barbara Guenst ( hereinafter"Guenst"), is demanding that each Union member Plaintiff submit complete mental health records, including the notes from their private therapy sessions, in order for them to be able to return to full duty. *Id.* Due to the highly sensitive nature of the directive to provide PECO with their respective therapists' notes, the individual Local 614 member Plaintiffs and their health care providers have been unwilling to comply. Duckrey Aff., at ¶¶ 20-23; Koniewicz Aff., at ¶¶ 16, 24; Kulchinski Aff., at ¶¶ 25-26. These Plaintiffs have offered to provide other documentation from their doctors to demonstrate their fitness for duty, but without the actual notes from the therapy sessions, Ms. Guenst will not provide ME Certificates or clear them to return to work. Duckrey Aff., at ¶¶ 16; 24; Koniewicz Aff., at ¶¶ 15; 21; 27; Kulchinski Aff., at ¶24.

The CBA contains, at Article 3.5, an anti-discrimination provision, and a broad grievance clause beginning at Article X that allows for the arbitration of contractual disputes, and on October 23, 2023, Local 614 filed Grievances on behalf of Duckrey, Koniewicz, and Kulchinski contending that PECOs treatment of them violates, *inter alia*, Article 3.5 of the Agreement. Anastasi Aff. at ¶ 28. However, the grievance procedure provides that arbitrations will be scheduled in the order that they are appealed to arbitration, unless the grievance involves discharge, or the parties otherwise agree, and separate grievances may not be joined in one arbitration proceeding unless the parties mutually consent. Anastasi Aff. ¶ 30. There are currently at least five (5) other, unrelated grievances that have already been appealed to arbitration, and all of these must be "scheduled and heard" before any of the Grievances that were filed on behalf of the Union member Plaintiffs. Anastasi Aff. ¶ 31. PECO has rarely, if ever, agreed to combine grievances into one hearing or expedite the arbitration process. Anastasi Aff. ¶ 33. Indeed, on November 7, 2023, PECO representatives refused to give Local 614 Business Manager and President, Lawrence J. Anastasi, any assurance that it would consolidate or expedite the Grievances in this case. Anastasi Aff., at ¶¶ 40-41. These Grievances are therefore unlikely to be heard and decided until late 2024 or early 2025. Anastasi Aff. ¶ 31.

### A. Damien Duckrey

Plaintiff Duckrey has been employed by PECO since September 2013, and he is currently classified as a 1st Class Line Mechanic in the Company's Distribution System Operation Department. Duckrey Aff. ¶ 1-2. His duties entail locating faults in underground electric systems, splicing and terminating underground cable, and doing underground troubleshooting on the network system in Philadelphia and surrounding counties in Pennsylvania. Duckrey Aff. ¶ 3. This position requires Duckrey to hold and maintain a CDL. *Id*.

In November 2022, Duckrey requested a leave of absence and STD to deal with stress he was experiencing in his personal life. Duckrey Aff. ¶ 4. He sought treatment through the Company's Employee Assistance Program ("EAP") and began meeting regularly with a therapist, Dr. Huan Tang Lu, to receive treatment for his stress-related issues. Duckrey Aff. ¶ 5. At the conclusion of this treatment, Dr. Lu sent a report to OHS recommending Duckrey's return to work at full duty. Duckrey Aff. ¶ 6.

Upon receiving Dr. Lu's report, OHS informed Duckrey that he would need to attend additional counseling for "substance abuse" before they would approve his return to his ob. Duckrey Aff. ¶ 7. The rationale of this recommendation remains unclear; the reason for Duckrey's leave was entirely unrelated to alcohol or drug use, he had never failed a drug or alcohol test, nor been accused of possessing, using or being impaired by any prohibited substance while working, and Dr. Lu did not indicate in his report that Duckrey had any problem with substance use. Duckrey Aff. ¶ 7-8. Nevertheless, at OHS's insistence, Duckrey attended a substance abuse program so that he could come off of STD. Duckrey Aff. ¶ 9. He began seeing a Health Care Provider and Counselor, Greg Pryor of Life Spring Counseling, and by April 2023, Duckrey had returned to work at PECO. Duckrey Aff. ¶ 9-10.

Shortly thereafter, Duckrey reached out to OHS to renew his ME Certificate for his CDL. Duckrey Aff. ¶ 10. Once again, OHS instructed him to go back into a program, this time for "alcohol abuse," before it would grant him a CDL. *Id*. Guenst then Duckrey placed on modified duty pending the completion of this program. Duckrey Aff. ¶ 11. Although still permitted to perform all the other safety-sensitive duties of his job, Duckrey was not allowed to drive a PECO vehicle, or to accept call outs for overtime. *Id*.

Independently of OHS, and so he would still be considered by the Commonwealth of Pennsylvania as possessing a CDL, Duckrey obtained an ME Certificate in May 2023 through another qualified Medical Examiner. Duckrey Aff., at ¶18.

Pryor then advised Duckrey that if he attended six (6) Alcoholics Anonymous meetings, the Counselor would report to OHS that Duckrey was fit for duty. Duckrey Aff. ¶ 13. Duckrey complied with this requirement, but OHS still refused to grant him an ME Certificate. *Id.* Duckrey was then instructed by Pryor to undertake another program of therapy with Behavioral Counselor Richard Sockritter of CJT Behavioral Health,  slated to commence in August 2023. *Id.,* at ¶ 15.

Before these sessions even began, however, Guenst advised Duckrey that OHS would not "consider" him for "medical certification" unless OHS received "verification that your serious health condition is controlled."  Duckrey Aff., at ¶16. She further intimated she would " need a copy of [Duckrey's] therapy notes to confirm engagement with ongoing treatment," but when Duckrey advised Pryor of this, he assured Duckrey that he would not release any therapy notes, but would – as he promised earlier – advise OHS that Duckrey was fully fit for duty. *Id.,* at ¶ 17. And, when Duckrey began treating with Counselor Sockritter, Sockritter promised Duckrey that whatever was said in their sessions together would remain confidential. *Id.,* at 19. For this reason, Duckrey increasingly found that he was "greatly benefiting" from his sessions with Sockritter. *Id.*

On or about October 2, 2023, after several unsuccessful attempts to obtain information from OHS as to when he could be medically recertified, Duckrey emailed Guenst, and stated that Pryor and Sockritter would not release their notes from his therapy sessions, and requested that OHS provide him with "procedures or documentation to gain a better understanding" as to "why

this information [was] necessary" for clearance to receive his ME Certification. Duckrey Aff., at ¶ 20. He also wrote that he was "genuinely striving to restore the normalcy" to his life, "which [he] felt has been disturbed" by OHS' repeated insistence on his therapy notes. *Id.,* at ¶ 21.

Guenst did not respond to this missive, but later that day, OHS Registered Nurse Jason Wolfe wrote back, renewing OHS's demand to view the actual therapy notes maintained by his Counselors, including those of Sockritter in their ongoing sessions. *Id.,* at ¶ 22. "[W]ithout the progress notes from the treating therapist," Wolfe explained, "OHS cannot move forward with issuing a possible med cert and allowing you to resume full duty." *Id.* "Once the documentation is submitted by the therapist," continued Wolfe, "OHS can review and determine [if] it meets criteria to move forward with the process per protocol." *Id.*

When Duckrey informed Sockritter of OHS's intransigence, the Counselor remained adamant that he would not release his notes to any third party unless compelled by a court of law. Duckrey Aff. ¶ 23. Sockritter offered instead to prepare a summary report of Duckrey' s progress, but OHS has insisted that Duckrey will not be returned to full duty unless they receive the actual notes of his therapy sessions. Duckrey Aff. ¶ 24.

Being placed on modified duty has not only occasioned financial hardship for Duckrey as a result of losing overtime opportunities. It has also created significant stress and embarrassment for him, as co-workers and supervisors question why he has not yet returned to work full duty. Duckrey Aff. at ¶¶ 11, 25. Furthermore, Duckrey remains in therapy with Counselor Sockritter, and the effectiveness of his treatment has been hampered by the awareness that PECO may eventually become privy to everything that is said in their therapy sessions. Duckrey Aff. ¶ 26. The strain of wondering whether he will have to disclose these notes or be fired has been tremendously trying to Duckrey and has been counterproductive to the therapy that had been

largely successful for him until now. This stress also threatens to affect his job performance itself, which could have dangerous consequences for Duckrey and his co-workers. *Id.,* at ⁋ 28.

**B.    John Koniewicz**

Plaintiff Koniewicz has been employed by PECO since April 17, 2017, and he is currently classified as a Substation Operator-Maintenance Technician 1st Class in the Transmission and Substation ("T&S") Department. Koniewicz Aff. ¶ 1-2. His duties consist of opening or closing circuits for dispatchers to allow work to be performed on the system, inspecting substations, and maintaining, calibrating, and testing high voltage transformers and circuit breakers. Koniewicz Aff. at ¶ 3. He is not personally required to hold a CDL to perform this job. *Id.*

In June 2023, at the suggestion of his attorney, Koniewicz voluntarily entered the Brookdale Premier Addiction Recovery Center ("Brookdale") to begin a 31-day treatment program for alcohol use after being charged with an off-duty D.U.I. offense. *Id.*, at ¶¶ 4-6. Koniewicz went out on STD for the duration of his care. *Id.*, at ¶ 7. At Brookdale, Koniewicz received counseling from a therapist, Fred Collier, who assured him that anything he shared during their sessions would remain strictly confidential unless it involved a matter of imminent danger to himself or others. Koniewicz Aff. at ¶ 8.

On July 28, 2023, Koniewicz was released from Brookdale. Koniewicz Aff. at ¶ 9. Dr. Douglass Coslett and Patient Experience Manager Melanie Smith of Brookdale cleared Koniewicz to return to work without restrictions. *Id.* When Koniewicz contacted OHS, it informed him that he would need to be assessed by their EAP provider, an outfit called "Optum." *Id.*, at ¶ 10. After further evaluation by Optum, Koniewicz was recommended to undergo an

Intensive Outpatient Program ("IOP") for at least four weeks before he could return to work. *Id*., at ¶ 11.

Starting on August 10, 2023, Koniewicz entered an IOP at Recovery Centers of America ("RCA"), attending therapy sessions with Licensed Clinical Social Worker ("LCSW") Dana Marouchoc. Koniewicz Aff. ¶ 12. As with Koniewicz' s previous therapist, Marouchoc assured him that anything shared with her would remain strictly confidential. *Id*., at ¶ 13. On or about September 20, 2023, while continuing with the IOP, Koniewicz was cleared by Optum's Substance Abuse Professional Amiee Rohrer-Kraemer and Licensed Clinical Social Worker Ann Marie Brown to return to work without restrictions. *Id.,* at ¶ 14.

However, on the same date, OHS Manager Guenst wrote to Marouchoc stating that RCA would need her to complete a "physical demands/functional job analysis" and provide "medical/therapy notes" for "OHS Review" in order for Koniewicz to be returned to work. Koniewicz Aff. at ¶ 15. On September 27, 2023, Marouchoc replied to Guenst recommending that Koniewicz be returned to work, but stated that RCA does "not provide therapy session notes to third parties due to confidentiality concerns." *Id.,* at ¶ 16. In response, Guenst reiterated that OHS would not return Koniewicz to work without a copy of these records and, if they were not provided, she would discontinue his STD. *Id.*, at ¶ 18.

On October 2, Marouchoc completed PECO's Physical Demands/Functional Job Analysis and renewed her recommendation that Koniewicz could safely perform the duties of his position "with no restrictions." Koniewicz Aff. at ¶ 20. Guenst nonetheless remained insistent that Marouchoc send all "office notes/medical records" of Koniewicz's therapy sessions at RCA. *Id.,* at ¶ 21. On October 16, RCA's Outpatient Services Director, Megan Levan, wrote to Guenst and to her superior, Kimberly Baudek, explaining that "[i]t is not customary and would be

breaking confidentiality and HIPAA compliance to provide actual charting" of Koniewicz' s care at RCA. *Id.*, ¶ 24. In response, Baudek sent separate emails to Koniewicz and Levan repeating OHS's request for "clinical office notes." *Id.,* at ¶ 26. And, on October 23, Guenst wrote Koniewicz again, still demanding his "medical records," *i.e.,* notes of his therapist, Ms. Marouchoc, by the close of business on October 30. *Id.,* at ¶ 27.

Koniewicz last received a check for STD benefits on or about October 27, 2023, and given Guenst's threats discontinue his STD benefits while simultaneously preventing him from returning to work, Koniewicz faces the imminent danger of having no income to pay for his mortgage, bills, or uncovered medical expenses unless he releases the confidential therapy notes of Marouchoc and/or Collier. Koniewicz Aff. at ¶ 29. The pressure of wondering whether he will have to release these confidential notes has been intense, and has affected every aspect of his life. *Id.*, at ¶ 31.

### C.    Joshua Kulchinski

Kulchinski has been employed by PECO since September 12, 2022, and is currently classified as a Line School Apprentice Aerial Line Mechanic ("ALM") in the Construction and Maintenance ("C&M") Department. Kulchinski Aff. at ¶ 1-2. In training to become a 1st Class ALM, Kulchinski's present day duties include assisting senior ALMs in construction, maintenance, and repair of overhead electric distribution and service lines. *Id.*, at ¶ 3. He is required to obtain and maintain a CDL to do his job. *Id.*

In August 2022, Kulchinski underwent an OHS physical to be medically certified to hold a CDL. Kulchinski Aff. ¶ 4. During the certification process, he disclosed that he was on anti-depressant medication and was told by OHS that his primary care doctor, Dr. Dave Lewis, would need to complete a form with details regarding the medication and his ability to drive while on

duty. *Id*. Dr. Lewis completed the documentation and gave it to Kulchinski, who returned it to OHS, which promptly issued him an ME Certificate to hold a CDL. *Id.,* at ¶ 5.

A year later, Kulchinski began the process of renewing his certification for a CDL. Kulchinski Aff. at ¶ 6. He listed the same anti-depressant medication and, as before, Dr. Lewis completed the same form detailing the medications that Kulchinski was prescribed. *Id*. However, Kulchinski inadvertently failed to list an anti-anxiety medication that Dr. Lewis had prescribed just prior to the recertification, creating a so called "discrepancy" between his disclosure and that of Dr. Lewis. *Id.,* at ¶ 7-8. Allegedly because of this, Guenst demanded the personal therapy notes of Dr. Lewis before she would approve the re-certification. *Id.,* at ¶ 9. Kulchinski complained to Guenst that producing all of his doctor's confidential notes seemed invasive, and that he felt uncomfortable doing so. Guenst replied, "well, if you don't do it, then I can't approve you for the Certificate for your CDL." *Id.,* at 11. When Kulchinski tried to ask her additional questions about her directive, Guenst snapped, "I already gave you all the information. You just have to do what I said." *Id.*

Ultimately, and despite their mutual discomfort over the breadth and scope of the request, Kulchinski and Dr. Lewis complied and released the treatment notes. *Id.,* at ¶ 13. After receiving Dr. Lewis' treatment notes, Guenst decided that Kulchinski would need to be assessed for "substance abuse" issues. Kulchinski Aff. ¶ 14. Kulchinski was shocked at this development, as he did not recall discussing alcohol use with Dr. Lewis, but Guenst ordered him to be evaluated anyway by Anne Doan at Optum. *Id.,* at ¶ 15-16. Guenst then placed Kulchinski on modified duty. *Id.,* at. ¶ 17.

Kulchinski attended a video consultation with Optum's Substance Abuse Professional Vincent Rogers; at its conclusion, Rogers stated that he did not believe Kulchinski had a

substance abuse problem or that he was an alcoholic. Kulchinski Aff. at ¶ 20. Despite Rogers'
opinion, Kulchinski was directed to attend ten (10) sessions with a LCSW named Merle Mullins.
At the beginning of their sessions, Mullins provided Kulchinski with a "General Counseling
Agreement" which assured him that any disclosures he made to Mullins during the sessions were
"private and protected." Kulchinski Aff. ¶ 22.

Midway through his therapy with Mullins, Kulchinski received a telephone call from
Guenst. Kulchinski Aff. at ¶ 23. She demanded to know the identity of the therapist, and to see
his personal notes regarding their therapy sessions. *Id.* In a follow-up email, she repeated her
directive that "OHS will need a copy of the office notes from your therapist." *Id.,* at ¶ 24.

When informed of this development, Mullins expressed profound discomfort with
Guenst's demands, and told Kulchinski that he had never given out his personal therapy notes to
anyone since he began practicing in 1982. *Id.,* at ¶¶ 25-26. Mullins offered instead to provide
OHS with a narrowly tailored evaluative summary of the therapy sessions, but Kulchinski has no
confidence that Guenst will be satisfied with anything other than Mullin's personal notes of their
discussions. *Id.,* at ¶¶ 26-27.

Being on modified duty has made Kulchinski's work life extremely uncomfortable,
especially as an Apprentice; his training regimen has suffered, and his coworkers and senior
ALMs question his ability to perform the essential functions of the job. Kulchinski Aff. at ¶ 17.
Aerial Line Mechanics are a close-knit community, and they need to be able to trust one another
to work together safely in dangerous situations. Anastasi Aff. at ¶ ¶ 23-24. The doubts about
Kulchinski's capabilities have seriously eroded those bonds of trust and put his safety at risk. *Id.,*
at ¶¶ 23-24; 26. The threat of releasing his intimate conversations with Mullins is causing intense
stress for Kulchinski and has affected every aspect of his life. Kulchinski Aff. at ¶ 30.

On or about October 26, 2023, Local 614 filed Grievances on behalf of Damien Duckrey, John Koniewicz, and Joshua Kulchinski, contending, *inter alia*, that OHS's actions violate Article 3.5 of the Agreement, which prohibits Company discrimination on the basis of disability. Anastasi Aff., at ¶ 27. On November 7, 2023, Local 614 Business Manager Anastasi met with PECO representatives to discuss the Union's many problems with how OHS is treating his members, and in the course of this meeting, the topic of the recently filed individual Local 614 member Grievances came up. *Id.,* at ¶ 41. Anastasi requested that the Grievances be consolidated, placed at the head of the list of cases to be heard by a neutral arbitrator, and be processed on an expedited basis. PECO's representatives refused to agree to such terms. *Id.*

## II. Argument

Federal courts have jurisdiction over suits for violation of contracts between an employer and a labor organization under Section 301 of the Labor Management Relations Act. 29 U.S.C. §185. In general, the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq*., prohibits federal courts from issuing any restraining order or injunction in a case involving or growing out of a labor dispute. 29 U.S.C. §§ 101-115. However, the United States Supreme Court created an exception to this rule in the landmark decision *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970), holding that in cases where arbitration of the dispute is pending, an injunction is appropriate and indeed "necessary to prevent conduct that threatens or frustrates the arbitral process agreed to by the parties." *Nursing Home & Hosp. Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 (3d Cir. 1985), citing; *Boys Markets, Inc., supra.* Therefore, the exercise of the equity power of a federal court is fully warranted when it is "necessary to ensure

that an arbitral award in the union's favor" would not be a mere "hollow formality." *Id*.; *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1282 (3d Cir. 1979).

The test for a party seeking a *Boys Markets* injunction is that the underlying dispute must be arbitrable and, additionally, that the traditional requirements of injunctive relief, *i.e.,* (1) probability of success on the merits, (2) irreparable injury, (3) balance of hardships, and (4) whether the relief will be in the public interest, be satisfied. *Sky Vue Terrace*, at 1098; *Commc'ns Workers of Am. v. Verizon Communs., Inc.*, 255 F. Supp. 2d 479, 485 (E.D. Pa. 2003). We address each of these conditions in turn.

### A. The Union's dispute is arbitrable under the grievance procedure of the CBA

Beginning with the *Steelworkers Trilogy*, the Supreme Court has long held that there is a presumption of arbitrability for labor disputes:

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).

This presumption is "particularly applicable" where the arbitration clause is "broad," such as where the clause "provides for arbitration of 'any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder..." *AT&T Techs. V. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986); see also *Monfared v. St. Luke's Univ. Health Network*, 767 Fed. Appx. 377 (3d Cir. 2019).

The CBA in this matter features a broad arbitration clause covering "any complaint" and defining a "Grievance" as "a dispute...as to the interpretation, application of or compliance with the provisions of this Agreement." CBA Art. X, §§ 1-2. The strong presumption in favor of arbitrability thus abundantly applies. As there is no doubt that Local 614's Grievances on behalf

of the Union member plaintiffs involve disputes over PECO's compliance with the anti-discrimination provision of the Agreement, it manifestly cannot "be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf Navigation Co*., at 582-83; Anastasi Aff. ¶¶ 27-28. Thus, the first condition for injunctive relief is easily satisfied.

**B. The Union's position in these grievances is sufficiently sound to prevent arbitration from being a futile endeavor, and thus the "likelihood of success" prong of the *Boys Markets* test has been met**

In the context of a *Boys Market* injunction, "[t]here is widespread agreement that a careful analysis of likelihood of success on the merits is inappropriate...[T]he union need only show that the position it takes is sufficiently sound to prevent the arbitration from being a futile endeavor.'" *Indep. Oil Workers Union v. Mobil Oil Corp*., 777 F. Supp. 391, 396 (D.N.J. 1991) (quoting *Sky Vue,* 759 F.2d at 1098).

The contractual basis for arbitration in this matter is PECO's violation of the anti-discrimination provision of the CBA, which prohibits adverse action against any union employee because of such individual's "handicap." CBA Art. 3.5; Anastasi Aff. ¶ 28. PECO discriminated against the Union member Plaintiffs on the basis of "perceived" handicaps, *i.e.* disabilities, when it required them as a condition of preserving their jobs to disclose confidential health provider notes from their therapy sessions. Based on the statutory and case law surrounding disability discrimination, which prohibits the employer's actions in this case, Local 614's position is plainly "sufficiently sound" to warrant the Court's exercise of its equity power in aid of arbitration.

Labor arbitrators consistently interpret contractual anti-discrimination provisions in light of relevant statutory law. In their noted treatise on labor arbitration, Elkouri and Elkouri explain that "once a [discrimination] claim is submitted to an arbitrator, the provisions of the ADA, as judicially interpreted, certainly may be looked to for guidance and applied by the arbitrator to the extent relevant." Elkouri & Elkouri, *How Arbitration Works* 7th Ed., 10-32 to 10-33.[1]

The Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., prohibits discrimination against qualified individuals who are either disabled, have a record of disability, or are "regarded" by their employer as being disabled. The term "discrimination" under the ADA includes a prohibition against disability-related medical examinations and inquiries. 42 U.S.C. § 12112(d)(1); 29 C.F.R. 1630.4. For incumbent employees, "a covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

PECO's overbroad and invasive demands run utterly afoul of this provision of the ADA and, as such, constitute a clear violation of the CBA's anti-discrimination clause. The Company made inquiries as to the nature and severity of the plaintiffs' disabilities, and its insistence on obtaining all the private therapists' notes of these employees' care is far too sweeping and searching to be fairly considered "job-related and consistent with business necessity."

### i. Plaintiffs are qualified individuals who are covered by the ADA

---

[1] See also *GTE N.*, 113 LA 665, 672 (Brodsky, 1999) (where collective bargaining agreement contains a nondiscrimination clause and a "conflict with law" provision, the ADA will be considered in a discharged employee's grievance); *Thermo King Corp.*, 102 LA 612, 615-16 (Dworkin, 1993) (in determining whether an employer's actions in discharging an alleged disabled employee were discriminatory, the arbitrator looked to the ADA for guidance). For the Court's convenience, a copy of these representative arbitration decisions is appended to this Memorandum of Law.

Typically, a discrimination claim under the ADA requires a plaintiff to show that he or she is (1) a qualified individual and (2) actually disabled, has a record of disability, or is regarded as being disabled. 42 U.S.C. §§ 12112(a) and 12102(1). However, a plaintiff does not need to prove that they meet the statutory definition of disability when bringing "a claim against an employer who requires a medical examination or inquiry." *Franco v. Port Auth. Of New York*, 643 F. Supp. 3d 459, 466 (D.N.J. 2022).[2]

Nevertheless, all three employees whose experiences are detailed in this case are covered under the statutory umbrella of the ADA. A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The individual Local 614 member Plaintiffs in this matter have demonstrated that they can perform all the essential functions of their jobs. Duckrey and Kulchinski are actively working on modified duty, performing the most safety-sensitive aspects of their respective positions. Duckrey Aff. ¶ 11; Kulchinski Aff. ¶ 17. Indeed, the only task they are not allowed to perform is the piloting of certain Company vehicles, which has little to do with their actual capabilities, and is in actuality the *least* dangerous aspect of their respective job classifications. Anastasi Aff., at ¶ 25**.** Duckrey has also obtained a CDL from an independent, federally certified Medical Examiner and is qualified to drive commercial vehicles for any other employer in the state. Duckrey Aff. ¶ 18.

Koniewicz, who does not require a CDL to perform his job, has been cleared to return to full duty by four (4) different medical professionals at two (2) separate treatment facilities. Koniewicz Aff. ¶¶ 9, 14. He has completed all the required components of the Employee

---

[2] There is widespread agreement among the Circuits on this point. See *Wright v. Illinois Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 522 (7th Cir. 2015); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013); *Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011).

Assistance Program, and there is no evidence whatever that he is unable to perform the essential functions of his job. *Id*., at ‖‖ 20, 25.

It is also clear that PECO "regards" Duckrey, Koniewicz, and Kulchinski as being disabled. An individual is regarded as being disabled if "he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Substance use disorders such as alcoholism can constitute an impairment under the ADA. See *Bragdon v. Abbott*, 524 U.S. 624, 632-33. (1998); *RHJ Med. Ctr., Inc. v. City of DuBois*, 754 F. Supp. 2d 723, 751 and 756-757 (W.D. Pa. 2010). PECO, through its persistent demands that the Union member plaintiffs undergo treatment for alcohol use against the opinions of numerous medical practitioners, has demonstrated that it regards each of them as suffering from alcohol dependency, which is considered an impairment under the ADA. *Id*.; Koniewicz Aff. ¶¶ 10-11; Duckrey Aff. ¶ 9; Kulchinski Aff. ¶¶ 14-17, 21. And, the Company's insistence on viewing all therapeutic notes of the treatment of Duckrey, Koniewicz, and Kulchinski surely appears to constitute an action undertaken "because of an actual or perceived physical or mental impairment" which is prohibited under the ADA.

### ii. PECO's requests are prohibited inquiries that are not job-related or consistent with business necessity

A prohibited medical examination policy under 42 U.S.C. § 12112(d)(4) is one that "either requires a medical examination or requires disclosure of information regarding a disability or that 'may tend to reveal a disability.'" *Pa. State Troopers Ass'n v. Miller*, 621 F. Supp. 2d 246, 251 (M.D. Pa. 2008) (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 95 (2d Cir. 2003). The Company's demand in this case for employees to authorize disclosure

of private therapy notes, is clearly an inquiry that would "tend to reveal a disability." *Id*. The requirement on its face is explicitly intended to investigate the "nature and severity" of the alleged alcoholism or substance dependency of these workers.

Having shown that PECO's requirement for the Union member Plaintiffs to disclose their therapy notes constitutes a prohibited medical inquiry, the burden shifts to the employer to demonstrate that the requirement is "job-related and consistent with business necessity." *Franco v. Port Auth. Of New York*, 643 F. Supp. 3d 459, 467 (D.N.J. 2022). "The employer's burden is high, and the test is an objective one." *Id*.; see *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001). To prove that a required medical inquiry is job-related and consistent with business necessity, PECO must prove that (1) the asserted business necessity is vital to its business, and (2) the medical inquiries genuinely serve the asserted business necessity and that the requests are no broader nor more intrusive than necessary. *Franco* at 467-468.

OHS's demands go leagues beyond this carefully constrained exception. While PECO surely has an important interest in protecting the safety of its employees and the public, which necessitates some amount of medical evaluation, the Company fails the second prong of the exception for business necessity because its request for therapist's notes is massively broader and more intrusive than necessary. In order to qualify for the business necessity exception, such inquiries "must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue." *Tice* at 515. Indeed, corralling the invasiveness of medical inquiries is the very purpose of this provision of the ADA. See *Sullivan v. River Valley School District*, 197 F.3d 804, 812 (6th Cir. 1999) ("The ADA limits an employer's ability to request unfounded examination to prevent the unwanted exposure of the employee's disability and the stigma it may carry.").

An abundance of EEOC guidance demonstrates that PECO's request for the complete mental health records of the Union member Plaintiffs is utterly inconsistent with "business necessity":

> An employer is entitled only to the information necessary to determine whether the employee can do the essential functions of the job or work without posing a direct threat. This means that, in most situations, an employer cannot request an employee's **complete medical records** because they are likely to contain **information unrelated to whether the employee can perform his/her essential functions or work without posing a direct threat**.

"EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act," Question 13 (July 27, 2000) (emphasis added).

Another example provided by the EEOC explicitly states that an inquiry into the details of a therapy session is beyond the scope of a medical inquiry that is job-related and consistent with business necessity:

> An employee with depression seeks to return to work after a leave of absence during which she was hospitalized and her medication was adjusted. Her employer may request a fitness-for-duty examination because it has a reasonable belief, based on the employee's hospitalization and medication adjustment, that her ability to perform essential job functions may continue to be impaired by a medical condition. This examination, however, must be limited to the effect of her depression on her ability, with or without reasonable accommodation, to perform essential job functions. **Inquiries about her entire psychiatric history or about the details of her therapy sessions would, for example, exceed this limited scope**.

"EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities," Question 14, example D (March 25, 1997) (emphasis added).

OHS's sweeping directives at issue in this case are exceedingly broader and more intrusive than necessary. It is one thing to require an employee to undergo counseling or demand a psychological evaluation. It is another thing entirely to demand all the therapists' notes of the

employee. The Union member Plaintiffs have all been evaluated by specialists, received various levels of treatment, and have provided PECO with documentation certifying that they are fit for duty.

John Koniewicz was cleared to return to work by Dr. Douglass Cossett and Melanie Smith from Brookdale; he was cleared by Amiee Rohrer-Kramer and Ann Marie Brown from PECO's own EAP provider; and he was cleared by Dana Marouchoc from RCA. Koniewicz Aff. ¶¶ 9, 14, and 20.

Damien Duckrey provided a report from Dr. Huan Tang Lu, a medical provider recommended by PECO's own EAP, recommending a return to work at full duty, and Duckrey offered to provide a progress report from Behavioral Counselor Richard Sockritter, another provider approved by PECO, which OHS refused to accept. Duckrey Aff. ¶¶ 6 and

Joshua Kulchinski was evaluated by Dr. Dave Lewis, who completed a form verifying Kulchinski's ability to drive; he met with Substance Abuse Professional Vincent Rogers who did not believe that Kulchinski had a substance abuse problem; and he attended the required counseling sessions with Merle Mullins, who has offered to provide a summary report of Kulchinski's progress, which OHS has already indicated it will likely not accept. Kulchinski Aff. ¶¶ 4, 20, and 26-27.

None of this appears to be enough for Guenst and OHS. In addition to the specialists' recommendations, evaluations, and proffered reports, OHS insists on digging deeper to obtain the detailed session notes from these treatments, flying in the face of the medical community's standards for doctor-patient confidentiality. This policy is unreasonable; it seeks access to information that is wildly unrelated to the Company's safety concerns and blows well past what

is "necessary under the circumstances to establish the employee's fitness for the work at issue." *Tice* at 515.

Each individual Local 614 member Plaintiff was assured by their respective therapists that their conversations were confidential. Duckrey Aff. ¶ 19; Koniewicz Aff. ¶¶ 8, 13; Kulchinski Aff. ¶ 22. Self-evidently, their discussions likely encompassed a range of intimate, highly sensitive topics that would serve no purpose for OHS but to probe for unrelated issues and humiliate the Employees.

The outrageous overreach of this demand is sharply underscored by the unwillingness of the health care providers themselves to consent to such an inquiry. Duckrey Aff. ¶ 23; Koniewicz Aff. ¶ 24; Kulchinski Aff. ¶¶ 25-26. Their session notes are not just a peephole into the private thoughts and feelings of the patient; they also peer into the private thoughts and observations of the therapists herself, who has taken an oath to keep the confidentiality of her patient.

PECO may argue that these inquiries are required by law as part of the medical certification requirement for obtaining a CDL, at least for Duckrey and Kulchinski. But this is clearly erroneous, considering the fact that Duckrey was able to obtain an ME Certificate from an independent medical examiner who was federally certified to conduct such an examination. Duckrey Aff. ¶ 18. Nowhere in the Federal or state guidelines for CDL medical examinations is there a recommendation that Medical Examiners demand the complete session notes from a therapist in order to certify an individual with suspected mental health or substance use disorders.

At this juncture, it is important to stress that Plaintiffs are not asking this Court to render an ultimate judgment on the applicability of the ADA to the Union's contractual anti-discrimination claim; that is a job for the arbitrator. All that is required for present purposes is for

Plaintiffs to show that their position is "sufficiently sound to prevent the arbitration from being a futile endeavor." *Sky Vue Terrace* at 1098. In light of the preceding discussion, the arbitrators, upon hearing these cases, are likely to rule in favor of Local 614 on the issue of discrimination, and the standard for demonstrating a likelihood of success on the merits has been met for the issuance of injunctive relief.

**C. Union member Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction**

An "irreparable injury" in the context of a *Boys Market* injunction is one that is "so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party." *Commc'ns Workers of Am. v. Verizon Communs., Inc.*, 255 F. Supp. 2d 479, 485 (E.D. Pa. 2003). It is a degree of harm that "threatens or frustrates the arbitral process agreed to by the parties" and that "would render the award an empty victory." *Sky Vue Terrace*, 759 F.2d at 1098; *Verizon Communs.* at 485.

Reputational harm constitutes an irreparable injury. For example, "invasion of privacy associated with drug testing, and resulting humiliation and damage to reputation, constitute irreparable injury." *Oil, Chem. & Atomic Workers Int'l Union, Local 2-286 v. Amoco Oil Co.*, 885 F.2d 697, 706 (10th Cir. 1989). In *Amoco Oil*, the employer unilaterally implemented a random drug-testing program over the union's objections. *Id.* at 699-700. The union filed a grievance and requested that the company postpone implementation of the program pending resolution of the grievance. *Id.* When the company refused, the union filed for a temporary restraining order and preliminary injunction, which the district court granted. *Id.* The 10th Circuit Court of Appeals upheld the decision, concluding that "in light of the invasion of privacy threatened by Amoco's testing program, and the potential for stigmatization and humiliation of

its employees, we do not believe that an arbitral award of reinstatement and backpay could make affected employees whole." *Id*. at 707.

Neither the 3rd Circuit nor the Eastern District of Pennsylvania appear to have yet commented on *Amoco Oil;* However, the 10th Circuit's approach has been at least partially adopted within this Circuit by the District of New Jersey, which held that "employer action that would frustrate, or threaten the integrity of the arbitration process itself, but that would fall short of completely disabling or vitiating arbitration, might warrant injunctive intervention." *Independent Oil Workers Union v. Mobil Oil Corp.*, 777 F. Supp. 391, 397-398 (D.N.J. 1991) (internal quotations omitted). While the District Court in *Mobil Oil* found - on the specific facts of that case - that the implementation of a random drug testing program would not justify an injunction, it plainly rejected the argument that "there are no privacy interests at stake" and noted that, in different circumstances, an invasion of privacy would be substantial enough to warrant such equitable relief. *Id*. at 398.[3]

Even if the eventual remedy would include some monetary damages, such as backpay, "the fact that payment of monies is involved does not automatically preclude a finding of irreparable injury." *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979). For example, where money damages are implicated as a potential remedy for the employer's threatened action to take away the employees' medical insurance, "the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury.'" *Id*.

---

[3] The court also based its conclusion partially on the fact that the union in that case was "apparently satisfied with the [drug testing] program's procedural elements." *Mobil Oil* at 398. Here, the union is most certainly not satisfied with the outrageous and invasive conduct of OHS.

The Union member Plaintiffs in the instant case, much like the plaintiffs in *Amoco Oil*, face stigmatization, embarrassment, and imminent harm to their reputations and privacy. By the time these grievances are heard and decided by an arbitrator, their injuries will have already come to pass. Meanwhile, they will continue working on modified duty, or remain on STD, until they are forced to decide whether to lose their jobs or give up their private health information. Once their privacy has been breached and the intimate details of their therapeutic treatment revealed, no conceivable arbitral award could begin to truly make them whole.

Furthermore, OHS has fostered an untenable situation that jeopardizes the safety of the Union member Plaintiffs who are still on modified duty. Both Duckrey and Kulchinski rely on medical treatment, including therapy, for conditions related to stress, depression, and anxiety. Duckrey Aff. ¶ 26; Kulchinski Aff. ¶¶ 6-7; 23. The looming threat of divulgence has had and will continue to have a chilling effect on that treatment. Without adequate treatment, the Plaintiffs' symptoms may slowly creep back in, creating, potentially, a lack of focus that can seriously imperil safety on the jobsite. Anastasi Aff. ¶ 26. An arbitral award will be a "hollow victory" for someone who has spent months without adequate mental health treatment, as was the case for the employees in *Fort Pitt*. Thus, the irreparable harm element is satisfied.

### D. The Balance of Equities

As demonstrated above and through the attached affidavits, the potential and irreparable damage to the Union member Plaintiffs is great. PECO, on the other hand, can only claim that it may be harmed because it will be forced to override supposedly legitimate safety concerns. Considering the fact that all three Union member Plaintiffs have been cleared by numerous health professionals to return to work at full duty, as well as the fact that Duckrey and Kulchinski are currently working modified duty where they perform the most dangerous elements of their

jobs on a daily basis, PECO could not possibly voice such a concern with a straight face. In fact, for Duckrey and Kulchinski, driving Company vehicles is far and away the safest part of their respective jobs. Anastasi Aff., at ¶ 25.

PECO has informed the Union that it will not permit this case to be expedited or consolidated. Anastasi Aff., at ¶¶ 40-41. Consequently, the Union member Plaintiffs will likely have to wait over a year for their Grievances to travel the long road to arbitration. PECO, meanwhile, suffers no harm from this delay. The balance of equities therefore weighs heavily in favor of injunctive relief.

### E. The Public Interest

It is fundamental federal labor policy to "encourage[e] and promot[e] the voluntary resolution of labor disputes through arbitration." *Sky Vue Terrace* at 1098; *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). In fact, this policy lays the very foundation for the *Boys Market* exception. *Boys Markets, Inc. v. Retail Clerk's Union*, 398 U.S. 235, 243 (1970). Exercise of the Court's equity power in this case advances the public interest by promoting the use of arbitration to resolve labor disputes.

PECO may repeat its claim that an injunction would generate safety concerns for the public, by allowing employees back to work against the objections of its in-house Medical Examiner. But again, this argument is belied by the fact that all of the Plaintiffs have been thoroughly evaluated by specialists at the Company's request (specialists who were in some cases hand-picked by OHS), and those specialists have recommended them to be returned to full duty. And, any attempt by PECO to suggest that its request for detailed information about private therapy conversations is motivated by a concern for the safety of the public rings profoundly

hollow and hypercritical, given the Company's decision to allow Duckrey and Kulchinski to continue performing the most dangerous parts of their jobs.

### III. Conclusion

For the foregoing reasons, the Court should issue a preliminary injunction in aid of arbitration, and order the Company to (1) refrain from demanding confidential medical records from its employes as a condition of employment; (2) immediately reinstate Damien Duckrey, John Koniewicz, and Joshua Kulchinski to full employment, pending the arbitration of the underlying dispute in their cases; and (3) agree to consolidate and expedite the arbitration over these cases.

Respectfully submitted,

**SPEAR WILDERMAN, P.C.**

**BY:** _____/s/Charles T. Joyce _____
        **CHARLES T. JOYCE**
        **I.D. #51254**
        **Attorneys for Plaintiff IBEW Local 614**
        **230 S. Broad Street, Suite 1650**
        **Philadelphia, Pennsylvania 19102**
        **(215) 732-0101**
        **(215) 732-7790 (Fax)**
        **(484) 682-4650 (cell)**

**Dated:**      November 9, 2023

# APPENDIX

in individual class sizes, they were due to one or more of the following factors (to which the Board is required to give special consideration under Article 12.B): students' choice of classes, teacher preferences, space limitations and funding limitations.

The language contained in Article 12.F of the Joint Exhibit 1 is inconsistent with the agreement reached by the parties during negotiations for the current Agreement. It is unnecessary for the Arbitrator to rule on this issue if he determines the Board has indeed complied with Article 12.F, as the language is contained in Joint Exhibit 1. However, should he interpret Article 12.F of Joint Exhibit 1 to mean each individual class and each individual section must be equal, then he must determine whether or not Article 12.F as stated in Joint Exhibit 1 is the provision agreed to by the parties. The evidence clearly establishes that it is not. The Association either made an error in its preparation of the Agreement or it has engaged in an act of fraud.

Accordingly, the Arbitrator must find that Joint Exhibit 1 fails to properly reflect the parties' agreement. When all of Article 12 is read together, it must be interpreted to require that the Board shall make good faith efforts to keep class sizes to a minimum and within the constraints of such things as student needs, scheduling issues, physical space and financial ability, strive to provide equitable balance among classes.

In addition to other allegations, SELDTA alleges that the Board has violated Article 8 of the Agreement regarding staff involvement in decision-making. The Association has failed to carry its burden of proof. SELDTA failed to provide any evidence to support this allegation.

By filing these grievances, SELDTA seeks to have the Arbitrator insert into the Agreement what SELDTA was unable to negotiate—an absolute class size maximum of twenty-five. Both the clear language of the Agreement and the parties' bargaining history illustrate that no such requirement exists in the Agreement. Rather, the Board is required to use serious, good faith efforts to minimize and equalize class sizes, but giving special consideration to factors such as student and teacher preferences and to space and funding limitations which are significant as this District is one of the poorest in the State of Ohio. A review of the Board's efforts to address class size illustrates that it has clearly complied with the

Accordingly, the Arbitrator should deny these grievances.

**Findings and Discussion**

As indicated above, the essential underlying facts in the within grievances are not in dispute and the issue is a straight-forward matter of contract interpretation. The rule primarily to be observed in the construction of written agreements is that the interpreter must, if possible, ascertain and give effect to the mutual intent of the parties. The collective bargaining agreement should be construed, not narrowly and technically, but broadly so as to accomplish its evident aims. In determining the intent of the parties, inquiry is made as to what the language meant to the parties when the agreement was written. It is this meaning that governs, not the meaning that can possibly be read into the language.

The Employer is correct that the Collective Bargaining Agreement does not contain an absolute class size maximum of twenty-five (25) students. Rather, the parties have agreed to a two-prong approach to the issue of individual class size. First, the Board agrees that it will continue to strive to maintain *minimum* class sizes, subject to certain considerations with respect to students, teachers, class space, etc. The term "minimum" is not specifically defined in the Collective Bargaining Agreement.

Secondly, the Board has agreed that it will "strive" for class sizes of a maximum of twenty-five (25) students. The term "strive" is also not specifically defined in the Collective Bargaining Agreement. However, a standard dictionary defines that term as follows: "to devote serious effort or energy; endeavor."

The narrow issue presented, therefore, is whether the Employer has made serious, good faith efforts to keep class sizes at a maximum of twenty-five (25) students or less. A careful review of the evidence presented reflects that the Employer has, in most cases, made a serious, good faith effort to keep class sizes below twenty-five (25), after giving consideration to such factors as the needs of students and teachers and the impact on class space and available funding.

[1] However, I find that the Employer could, in fact, have done more to minimize class sizes by adding additional teaching periods and/or rearranging teachers' scheduled prep periods. Pursuant to Article 21.C, the school day can be no longer than seven (7) hours, which is inclusive of a thirty

(30) minute lunch period and forty-one (41) minutes of planning time. This is not an overly arduous work day and since there are no limitations in the Collective Bargaining Agreement as to how many instructional periods can be assigned to a teacher, this area alone could have a dramatic impact on maintaining minimum class sizes. The same can be said for not adhering to the concept of allowing all teachers to have their prep period as the last period of the school day. The Employer admits that in at least one situation, class sizes could have been reduced below twenty-five (25) by switching the time of the study period. It did not do so out of deference to the teacher's wishes.

While I understand the Employer was, in good faith, attempting to acquiesce to "teacher preferences", these two areas, if left alone, can create many artificial barriers that impact on maintaining minimum class sizes. The greater good of achieving more suitable class sizes must give way to the preferences of several individual teachers.

The issue raised by the Employer as to whether Article 12.F, of Joint Exhibit 1, reflects the actual agreement reached by the parties during negotiations for the current agreement is, ultimately, a non-issue. Comparing this provision with Article 12.F of the 1994-97 Collective Bargaining Agreement, reveals that both talk in terms of class sizes being equalized. Reading Article 12 as a whole in both Collective Bargaining Agreements, reveals little or no distinction between the terms "class size" and "class size/instructional periods". The parties' use of the term "class size" throughout both articles is clear and consistent. They are referring to the number of students in a single instructional period.

The issue then becomes whether the Employer has, in fact, equalized class sizes throughout each subject area. It is clear the Employer has not. Moreover, as indicated above, its failure to take into consideration adding additional classes and moving teacher prep periods has dramatically impacted its ability to fully comply with this provision.

Finally, the Association has failed to sustain its burden of proving any violation of Article 8 of the Collective Bargaining Agreement. The Faculty Council is a jointly operated forum through which either party may raise suggestions or concerns regarding issues impacting on the school environment. If faculty meetings were not scheduled and/or held, the fault lies with both parties and not one more

than the other. Moreover, the Association did not offer any evidence that the Board was in any manner uncooperative in allowing the Faculty Council to function during the school year. It is pretty obvious that any inaction by the Faculty Council was a result of the tacit approval of both parties.

**AWARD**

[2] The Grievance is sustained. The Employer must take into consideration the option of adding more instructional periods to the teachers' work day and also changing teacher prep periods in order to strive to keep classes at a maximum of twenty-five (25) students and to equalize individual class sizes in each grade level/subject area.

Jurisdiction shall be retained in order to insure compliance with this Award.

---

**GTE NORTH INC. —**
**Decision of Arbitrator**

In re GTE NORTH INCORPORATED and INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 986, FMCS Case No. 99/16577, October 30, 1999

Arbitrator: Deborah M. Brodsky, selected by parties through procedures of the Federal Mediation and Conciliation Service

**DISABILITY**

**1. ADA ▸106.07 ▸94.553 ▸93.48**

Applicability of Americans with Disabilities Act (ADA) to injured employee who was discharged will be considered, where collective-bargaining contract contains both non-discrimination clause and "Conflict with Law" provision, employer raised defenses against ADA argument proffered by union, and compliance with ADA can be viewed in situation as component of "just cause."

**2. Individual with disability ▸118.655**

Discharged employee who had leg and hip injuries is not qualified individual with disability covered by Americans with Disabilities Act, even though he has lifelong restrictions against climbing and prolonged standing, since these restrictions do not substantially limit his major life activities; he can still eat, breathe, care for himself, and work.

### 3. Reassignment ▸106.20 ▸120.03

Employer complied with Americans with Disabilities Act (ADA) when it made attempts to reassign employee who had leg and hip injuries, even though it offered jobs that paid less, and some of reassignment offers required interview or test, where employer attempted to assign him to vacant position, employer may reassign injured employee to lower-paying jobs, employer may choose accommodation for disabled employee, and ADA does not require employer abandon its nondiscriminatory policies defining qualifications, prerequisites, and entitlements to transfers.

### 4. Special job ▸118.655

Employer had just cause to discharge employee who had leg and hip injuries that gave him lifelong restrictions against climbing and prolonged standing and who turned down jobs offered him, where his only proposed accommodation was of special job that paid rate of cable splicer job he had held without requiring him to climb to repair cable, Americans with Disabilities Act does not require creation of new job, and other splicers would resent someone who only worked indoors.

Appearances: For the employer — Thomas W. Belleperche, attorney; Susan Banning, manager-access design & construction; Mary J. Darling, regional manager-labor relations; Chris Schnitz, section manager-access design & construction. For the union — Thomas E. Cook, international representative; Ben F. Rice, business manager-financial secretary.

## SPECIAL JOB

### Background

BRODSKY, Arbitrator: — The grievant, "Z—," began his employment with GTE North Incorporated (hereafter "GTE," "Employer," or "Company") over twenty-one years ago. Z— is a member of the International Brotherhood of Electrical Workers, Local 986 (hereafter "Union" or "IBEW"). During all relevant periods of employment, Z— was classified as a Construction Cable Splicer ["CCS"].

CCSs perform a variety of tasks, which are normally related to installing and servicing cable. Approximately 50% of CCS work is performed overhead on aerial cable and 50% deals with buried cable which is underground.

In 1993, GTE began what was known as the "Line Cut Program." This special project utilized several employees to perform computer work. These employees were removed from their regular work sites and stationed doing computer work for approximately 90% of their workday. The employees continued to be paid and classified in their regular rates and regular jobs. Z— was placed on this project and the Company continued to compensate him at his regular CCS rate of pay.

Placement in the Line Cut assignment also happened to be consistent with Z—'s need for light duty because he suffered from a non-job-related injury known as "avascular necrosis" of the right hip. This necrosis was surgically treated on May 24, 1995 and on July 16, 1996, Z— was given a lifelong medical restriction, which prevented him from climbing or digging.

On July 29, 1996, the grievant fell in a hole while at work. His left leg fell into the hole, while his right leg stayed above the hole. As a result, Z— fractured his right femoral head. The grievant remained off work on Workers' Compensation after this diagnosis. On January 31, 1997, Z— underwent surgery to his right hip, which included the placement of a titanium screw.

On April 2, 1997, Susan Banning, Z—'s Manager, sent him a letter. It indicated that the Company had been informed by Z—'s doctor that he was being restricted from performing the physical requirements of a CCS job, but that he could perform sedentary work. It further indicated that restricted work would not be available beyond April 11, 1997 and offered him the following options:

1. Return to work as Service Representative in Marion, Ohio subject to successful passing of any validated testing.
2. Medical leave of absence subject to the appropriate approval.
3. Voluntary resignation.

The letter went on to state that if he did not select an option by April 11, 1997 he would be considered as a voluntary termination.

The IBEW responded to Ms. Banning in a letter dated April 19, 1997, indicating that Z— was not accepting any of the three options because 1) his doctor indicated that Z— was to be off work until July 1, 1997 and 2) Article 12 of the labor agreement provides for accident disability benefits.

Nonetheless, James Wolbert, Manager of Human Resources, sent Z— forms to apply for leaves of absence. In an April 15, 1997 letter, Mr. Wolbert informed Z— that the forms had to be submitted by April 24, 1997 or that he would be viewed as a voluntary resignation.

Z—'s physician, Dr. Shaffer, later extended his estimated return to work date to August 1, 1997. Mr. Wolbert sent a letter dated July 8, 1997 allowing the grievant until August 1, 1997 to provide the Company with a full release to return to duty as a CCS from both Dr. Shaffer and an independent medical examiner that Z— was due to see on July 11, 1997.

On November 10, 1997, Z— was again examined by Dr. Shaffer but still not released for full CCS work. Z—, in fact, was permanently restricted from climbing and constant standing. In a letter dated November 21, 1997, Mr. Wolbert informed Z— that:

Restricted work is not available, and although you informed me on October 15 that you were not interested in positions that are less than lateral moves or promotions, your physician has again advised you that you are restricted to performing sedentary job duties. Therefore, GTE offers you the following options:

— return to work as a Service Representative in Marion, Ohio subject to passing validated testing

— medical leave of absence subject to appropriate approval

— voluntary resignation

Please consider these options and notify me which option you have selected by December 3, 1997; if you do not, I shall consider your choice as a voluntary termination effective December 3, 1997.

On December 1, 1997, Dr. Shaffer returned Z— to work, having reached his maximum medical improvement. The grievant was, however, not released to perform his CCS job because of his "no climbing or constant standing" restrictions.

On January 20, 1998, Mr. Wolbert sent a letter to Z— reiterating his January 7, 1998 offer to him to work as a Retail Sales Consultant in Medina, Ohio. This letter also mentioned that on January 13, 1998, GTE offered Z— a Service Representative position in Marion, Ohio (about 1 hour, 45 minutes from Medina). This letter also apparently told Z— about GTE Internet sites listing job openings.

On January 27, 1998 Mr. Wolbert sent Z— a letter confirming a January 26, 1998 telephone conversation where Z— refused the Service Representative position in Marion. Mr. Wolbert offered Z— another opportunity, to fill a Dispatch Clerk vacancy in Norwalk, OH. Mr. Wolbert told Z— to let the Company know by February 2nd or the grievant will be deemed a voluntary termination.

On January 29, 1998 a District Hearing Officer for Workers' Compensation stated that temporary total compensation shall be terminated effective November 21, 1997 based on Dr. Shaffer's findings.

On June 11, 1998, the Company sent Z— a letter that stated that since no communication has been received from the grievant since January 27, 1998, the Company will consider him to be a voluntary termination as of June 12, 1998. Z— was terminated as of June 12, 1998.

On June 18, 1998, the Union filed the subject grievance. It stated:

Violation of Article 1, Section 1.1; Article 3; Article 20, Section 20.4 ¹ and any other Section that may apply. Grievant terminated without just cause.

It requested that the grievant be reinstated and made whole.

On August 3, 1998, the Company gave its final step response to the subject grievance. Regional Manager of Labor Relations, Mary Darling stated:

The Company denies any violation of Article 1, Section 1.1; Article 3; Article 20, Section 20.4 and any other articles of the contract that may apply. In April of 1997, the grievant was sent a letter outlining available options to him due to his permanent restriction of "No Climbing & Constant Standing". Since climbing is an essential function of a cable splicer's duties the medical/company opinion is that the grievant could not be returned to his former position. As independent medical exams and further information was collected up-dated option letters have been shared with the grievant with the final option letter being sent to him on January 27, 1998. As the grievant declined to exercise any of the available options offered to him over the past fifteen months the Company terminated his employment effective June 12, 1998. Noting the above information this grievance shall therefore be denied.

### Issue

Did the Company possess just cause to terminate Z—'s employment effective June 12, 1998? If not, what is the appropriate remedy?

### Relevant Contract Provisions

#### ARTICLE 1
#### RECOGNITION

* * *

SECTION 1.1.1. The Company and the Union reaffirm the policy of nondiscrimination because of race, creed, color, religion, national origin, sex, handicap status, disabled veteran status, age, and veteran of the Vietnam Era.

* * *

#### ARTICLE 2
#### DEFINITIONS

As used in this Contract, the following terms shall have the following meaning:

---

¹ Section 20.4 provides "that employment benefits not otherwise provided in this Agreement shall not be diminished during the duration of this Agreement..."

* * *

SECTION 2.13. "Grievance" means any dispute between the Company and an employee or the Union involving the interpretation or application of any provision of this Agreement.

## ARTICLE 3
## RESPONSIBILITY OF MANAGEMENT

SECTION 3.1. Nothing contained in this Agreement shall be deemed to limit the Company in any way in the exercise of the regular generally recognized customary functions and responsibilities of Management of the business and direction of the working force consistent with safe working practices including the right to hire, to use improved methods or equipment, to combine jobs, to discontinue jobs, to determine work assignments and tours, to decide the number of employees needed at any particular time or place, to establish reasonable rules and regulations, to discipline and discharge employees for cause and to be the sole judge of the communications service rendered to the public. Moreover, such functions of Management as may be included herein shall not be deemed to limit other functions of Management not specifically included herein.

SECTION 3.2. The right of the Company to establish, determine and maintain standards of telephone service to the public is fully recognized. The Company shall not be required to retain in its employ any employee who fails continuously to meet established work standards unless such a failure arises from causes due to working conditions beyond the employee's control. . .

## ARTICLE 4
## GRIEVANCE PROCEDURE

* * *

SECTION 4.9. No terms can be added to this Contract nor any provision thereof changed by arbitration. With respect to the interpretation or application of any provisions of this Agreement the decision of the arbitrators shall be final and binding upon the parties. Notwithstanding anything to the contrary contained in this Agreement, the following matters shall be excluded from arbitration except as to interpretation.

(a) Matters reserved to the Company by Article 3, Section 3.1 hereof, other than disputes as to the reasonableness of Company rules and regulations.

(b) Provision herein governing accredited service (Article 5) and wages, hours and conditions of employment, which are matters determined by collective bargaining.

* * *

## ARTICLE 18
## CONFLICT WITH LAW

SECTION 18.1. If at any time any provision of this Agreement shall in any way not be in conformity with any law of the State of Ohio or Federal law or regulation, or any official interpretation of any such law or regulation, or any order or pronouncement of the President of the United States, such provision, to the extent of the non-conforming portion thereof, shall be of no force or effect during the time of such non-conformance.

* * *

MEMORANDUM OF AGREEMENT
BETWEEN
GTE NORTH INCORPORATED (NORTH-EAST REGION)
AND
INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL 986

*PAYMENT OF ARBITRATOR*

The Company and the Union agree that the losing party shall pay all cost of the arbitrator. At the end of one (1) year either party may cancel this memorandum. The Company and the Union may mutually agree to extend this memorandum on an annual basis.

GTE NORTH INCORPORATED (NORTH-EAST REGION)
I.B.E.W. LOCAL 986
MARY J. DARLING
Regl Manager-Labor Emp Relations
BENJAMIN F. RICE
Business Manager

### The Position of the Company

Attorney Thomas Belleperche asserted that the Company possessed just cause to terminate Z⎯'s employment. He stressed that the subject grievance does not specifically allege an Americans with Disabilities Act ["ADA"] violation. Susan Banning and Mary Darling testified on behalf of the Employer. Ms. Darling and Chris Schultz presented rebuttal testimony for GTE North.

Ms. Susan Banning, Manager--Access Design and Construction has been employed with the Company for 24 years. She testified that she met the grievant in 1993 when she managed the support group over his department. She stated that in July of 1996 she was a senior administrator of operations support. Ms. Banning introduced the job description for the CCS job into evidence. She testified that the job includes the various tasks listed including: climbing, lifting, reaching, bending, digging and standing. Ms. Banning stated that all CCSs perform the same job duties and that 50% of the cable is buried and 50% is aerial. Work on buried cable may be accessed through green pedestals.

Ms. Banning testified that she sent Z⎯ the April 2, 1997 letter and offered him three options. She noted that, had a job offer of comparable skill and wages been available, she would have made it to Z⎯. She stated that the service representative position in Marion, Ohio was one hour and forty-five minutes away from Z⎯ home base, which was Medina, Ohio.

Ms. Banning discussed the Line Cut program, stating that Z⎯ worked on the project between 1993 and 1996. However, she noted that there was no Line Cut work available for Z⎯ in 1997 or 1998, since the program was being phased out at that time due to its lack of success. She added that the Line Cut job was performed by several employees and was not created exclusively for the grievant. She maintained that, to her knowledge, between 1996 and the present time there were no cable splicers working on alternate projects.

Ms. Mary Darling, Regional Manager of Labor Relations for GTE North, testified that she handles labor relations for those employees in the IBEW Local 986 bargaining unit. Ms. Darling prepared a chronology covering the time from Z⎯ July 1996 injury to the present and submitted it into evidence. She emphasized that the Company offered the grievant six opportunities to return to some type of employment with the Company after his subject injury and that the Company even offered various opportunities to him subsequent to his termination. Prior to his termination, the Company offered three service representative positions (which are represented by the CWA) in Marion to Z⎯, one retail sales consultant position at a phone mart in Medina, and the Company also directed Z⎯ to check the Company Internet sites which post non-Union managerial-type positions. Finally, on Jan. 27, 1998, Z⎯ was offered a dispatch clerk position.

Ms. Darling mentioned that some correspondence was sent to Z⎯ through Jim Wolbert, who was the Human Resources Manager at the time. Mr. Wolbert left the Company in January of 1998. In June of 1998, Mr. Walczak, the current Human Resources Manager discovered that Z⎯ had never responded to the Company's options, so the Company terminated his employment.

Ms. Darling stressed that no physician ever released Z⎯ to return to a CCS job. Ms. Darling stated that although many of the job opportunities offered to Z⎯ were for lower paying positions, Workers' Compensation representatives told her that Workers' Compensation would compensate for the disparity in wages. Ms. Darling noted that even prior to the July 29, 1996 accident, Z⎯ was working in a light-duty capacity due to his previous surgery. She stated that the Company only provided light-duty for short term needs and that Z⎯ was kept on light-duty for an inordinately long period of time, up to 6 months. She added that 2 weeks before his Workers' Compensation injury, the Company re-

ceived a letter from his doctor stating that the grievant would have *lifelong* work restrictions due to the necrosis of his right hip. The restrictions included no climbing and no digging.

Ms. Darling explained that Z⎯ Workers' Compensation benefits were terminated as of December 1, 1997 when his doctor returned him to work with a permanent restriction of "no climbing and no constant standing." She stressed that climbing is an essential function of the CCS job and that for some of the aerial work, a ladder must be used, because not all lines can be accessed with a bucket truck (and even the bucket truck must be climbed in to and out of). She noted that the Company accommodates those employees who can perform the essential functions of their job and gave an example of blind (telephone) operators. She explained that the Union wants the Company to create a special position for Z⎯ involving just pedestal work.

In her rebuttal testimony, Ms. Darling noted that there were four or five employees working on the Line Cut Program, and all but one were CCSs. She said that all Line Cut employees were paid their regular hourly rate.

Mr. Chris Schultz, Senior Manager over Engineering and Construction for GTE, testified as a rebuttal witness on behalf of the Company that CCSs do varied work, some of which is more physically demanding than other work, depending upon the daily demands of the job. He noted that averaging out the work that CCSs do over a long time span, there could be enough work dealing with buried cable to keep one or two of approximately twelve CCSs busy through the course of a year. Likewise, he mentioned that there are some days when no pedestal work is available.

### The Union's Position

Mr. Thomas E. Cook, International Representative for the IBEW represented the Union in the subject case. He insisted that Z⎯'s grievance was a prime example of why the ADA was established. Mr. Cook maintained that the Company used Z⎯ for his computer skills and did not pay him more for his special project work when an outside consultant would have cost the Company much more money. Mr. Cook asserted that the Company no longer wanted to employ Z⎯ once he became "damaged goods." Mr. Cook further contended that Z⎯ and/or the Union responded by phone to every letter sent by the Company regarding the grievant's employment status. Mr. Cook alleged that the Company simply

wanted to get the grievant off of Workers' Compensation and that the Company "had no business" offering Z____ jobs which had paid considerably less money than the CCS job.

Witnesses Ben Rice and Z____ testified on the Union's behalf.

Mr. Rice, the Business Manager-Financial Secretary of Local 986 since 1993, testified that prior to this job he worked for GTE for 27 years. Mr. Rice testified that even though Z____'s doctor said he could not do aerial or ladder work, he could perform pedestal work "sitting on a box on the ground splicing cables... without any problem." Mr. Rice quoted Supervisor Chris Schultz as having said "there was enough pedestal work on the ground for one to three people a year." He noted that he could not see how any other CCS would be harmed if Z____ was accommodated in this manner, since the other CCSs normally climb ladders and dig.

Mr. Rice explained that when Z____ was assigned to the Line Cut computer job for approximately three years, complaints were received from other craft people because the grievant was working inside in air conditioning, but the Union did not file any grievances over that.

The grievant testified that he worked for the Company for over twenty-one years. He explained his role in the Line Cut Program including the fact that he attended computer school paid by GTE as well as having been sent to various parts of the county to help "sell" the Line Cut Program and also to teach other employees aspects of the program. In addition, Z____ noted that, from Medina, he functioned as the support location for other employees needing help with the program. He stated that he even gave this support when he was off work because of his hip surgery. Z____ testified that during his Line Cut assignment he was paid as a CCS and made approximately $18 per hour. He added that computer consultants earn anywhere from $40 to $60 per hour.

Z____ explained that in 1995, he had a pain in his hip, which the doctor said was avascular necrosis, a degenerative hip disease where the bone dies from the inside out. In approximately March of 1995, he had some bone graft surgery and noted that he was off work until approximately the fall of 1995.

Z____ testified that his hip became injured when he fell into a hole with one leg in July of 1996 when he was doing some flagger work as part of his CCS job. The grievant stated that he underwent additional surgery and the doctor told him that one more fall might permanently prevent him from walking, so he restricted the grievant from climbing. The grievant added that the Company never contested his previous Workers' Compensation claim from which he drew benefits from the July 1996 injury until December of 1997.

Z____ testified that the Company's April 1997 letters scared him. He stated that now he is able to do the CCS job with reasonable accommodations since he cannot climb a ladder or dig a hole, but he can do pedestal work. Z____ noted the he would gladly accept a lateral move or a job that paid more money. He also added that he is currently employed full time for "Office Temps" doing sedentary computer work and that he even works some overtime. Z____ testified that he has been assigned to the Cinergy Company doing classified technical writing for them at $22 per hour. The grievant testified that he has been employed at this assignment since March of 1998, prior to his GTE termination. Z____ explained that he landed this job by applying for it on the Internet and that he also applied for two GTE jobs through his Internet web site.

Mr. Cook stressed that the Company did not attempt to follow the Americans with Disabilities Act [ADA] with regard to Z____. He pointed out that GTE only offered jobs to the grievant which involved significant commuting and which paid anywhere from $4.92 to $9.31 less per hour than Z____ normal CCS rate of pay. Moreover, some of the Company's offers were merely offers for Z____ to interview or test for a job, but there was no guarantee that he would ultimately be awarded the position. The Union emphasized that there is more than enough buried cable work to keep Z____ employed as a CCS and that the Company never even explored this as a possible means of accommodating Z____. The IBEW stressed that the Company did not have just cause to terminate Z____'s employment and that he be made whole for all lost wages and benefits and be reinstated to GTE. Furthermore, the Union requested that the Company be ordered to comply with the ADA.

**Discussion and Findings**

In determining if GTE possessed just cause in terminating Z____'s employment, the Arbitrator must, first and foremost, look to whether this action was in violation of the collective bargaining agreement.

Section 3.1 establishes management rights and provides for the just cause standard in discharging employees.[1] Management rights include, *inter alia*, the right to "discontinue jobs, to determine work assignments..., to decide the number of employees needed at any particular time or place..."

The Union pointed to no specific contractual provision (and the Arbitrator did not note any in her examination of the contract) which requires the Company to retain employees in their job classification who can not continue to perform the full scope of their jobs.

The Company pointed out that Z____ was assigned to light duty work while he was recuperating from his initial surgery. Ms. Darling explained that the Company's usual policy is to assign light duty work to those employees suffering from a *temporary disability*. Ordinarily, such an assignment is for no more than 8 weeks, but GTE accommodated the grievant by leaving him on light duty for approximately 6 months. If Ms. Darling was referring to the Line Cut assignment, it appears that it was simply fortuitous that Z____ was already working a sedentary job at the time he needed light duty work (because of his then climbing and standing restrictions). Thus, the Company did not have to change the grievant's assignment to accommodate him. Nonetheless, whatever was done regarding Z____ light duty appears not to have been explicitly contractually mandated. In addition, in the subject case, the Union asserted that the Company owed the grievant a regular reassignment in lieu of termination and did not contend that he was a candidate for any further light duty.

It is clear that the Employer possesses the contractual right to reassign its employees. It attempted to move Z____ to other positions within the Company after his disability was determined to be permanent. If the grievant felt the transfer was inappropriate, he could have taken it and still have grieved the action.[2] But did the Employer violate any other labor agreement provisions when it discharged the grievant? The contract contains a nondiscrimination clause. Examining only the contract itself, the Union did not allege that Z____ was treated differently than other employees with lifelong work restrictions.

Instead, the IBEW argues that the Company shirked its responsibility to reasonably accommodate Z____ under the Americans with Disabilities Act [ADA].[3] GTE asserts that the ADA is not a proper subject for this arbitration.[4]

Giving the Union the benefit of the doubt, and assuming that the ADA issue has been properly appealed to this stage of the grievance procedure, the question arises as to whether the arbitrator has the authority to apply external law to the case at hand. This subject, in general, has been hotly debated over the years and arbitrators have made persuasive arguments regarding both schools of thought.[5]

One line of thinking involves arbitrators who refuse to apply external law and base their decisions squarely within the four corners of the contract. In *Jefferson-Smurfit Corp.*, 103 LA 1041 (Canestraight, 1994), the arbitrator found that the Employer did not violate the collective bargaining agreement when it discharged an employee whose injury made it impossible for her to do her job without accommodation where there was no language in the contract requiring the company to accommodate her. At page 1048, he noted:

[I]t is well settled that an employee who is physically unable to perform all the duties of his or her job may be removed from said job particularly where an employee has a physical disability which endangers his or her own safety or that of others... Therefore, absent some right in the contract requiring the Company to find a place to put such an employee, it may be said that cause exists under these circumstances to remove or discharge such an employee.

Other arbitrators have ruled similarly, holding that the interpretation of the ADA:

is a function of the appropriate agency or commission, and ultimately the courts, not the Arbitrator. The collective bargaining agreement is his charter, and the solution to the question presented must be found between its covers.[6]

One can see the similarities between the instant case and *Jefferson-Smurfit*. Here too, the Arbitrator views nothing in the contract itself that requires accommodation.

---

[1] Actually, this provision only states that the Company need have "cause" to discipline or discharge employees. This Arbitrator has viewed such language to be indistinguishable from just cause standards. In fact, the Company phrased the issue in this case in terms of "just cause."

[2] Here, the Arbitrator is only referring to those job offers made prior to Z____'s termination, since no termination grievance would have been filed if Z____ had chosen one of these job options.

[3] 42 U.S.C. §12112-12213.

[4] Indeed, the Company asserted this in its post-hearing brief, then went on to argue in the alternative, that GTE did not act in contravention of this law.

[5] *See Fairweather's Practice and Procedure in Labor Arbitration* ( BNA Books, 4th ed. 1999) pp. 576-582 for an up-to-date examination of this interesting topic.

[6] *Altoona Hospital*, 102 LA 650, 652 (Jones, 1993). *See also Multi-Clean, Inc.*, 102 LA 463 (Miller, 1993).

Since few contracts blatantly state that the Arbitrator has the authority to rule on external law, and such laws are rarely unambiguously incorporated into the contract, some arbitrators assert jurisdiction over external law in a circuitous manner. In *Alcoa Building Products*, 104 LA 364, 368 (Cerone, 1995), Arbitrator Cerone stated:

[e]ven where as here the contract is silent regarding the Arbitrator's legal authority to address external legal issues, the Arbitrator finds that both the potential conflict between federal law and the Agreement, as well as the parties' stipulations, allow the Arbitrator to apply external law to this case.

Several arbitrators have held that the contract incorporates the ADA by means of a general non-discrimination clause. See *Perfection Bakeries, Inc.*, 110 LA 1043 (Stallworth, 1997) and *Champion International Corp.*, 106 LA 1024 (Helwich, 1996). Some arbitrators discuss the ADA as part of their "just cause" analysis. See *Meijer Inc.*, 103 LA 834, 840 (Daniel).[6]

Arbitrator Bonnie Bogue found that it is not unusual for arbitrators to consider external law by reading non-discrimination clauses in conjunction with savings clauses (which preserves the rest of the contract if certain provisions are deemed to be in contravention of state or federal law).[7]

[1] In the subject case, the contract contains both a non-discrimination clause (Section 1.1.1) and a "Conflict with Law" provision (Article 19). In addition, although the parties did not stipulate as to the applicability of the ADA (as was the situation in *Alcoa Building Products, supra*), the Employer did raise its defenses against the ADA argument proffered by the Union. Furthermore, compliance with the ADA can also be viewed in the case at hand as a component of "just cause," a necessary element for discharge. For all these reasons, this Arbitrator is going to address the Union's ADA argument.

The ADA prohibits an employer from discriminating against a "qualified individual with a disability" as it applies to the terms and conditions of his/her employment. In *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633–34 [8 AD Cases 326] (6th Cir. 1998), the Court[8] noted:

To establish a prima facie case, a plaintiff must show that he or she: (1) has a disability; (2) is "otherwise qualified" to perform the essential functions of the job, with or without reasonable accommodation; and (3) was discharged solely because of the handicap. . . A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." . . . An employer than has the burden of persuasion to show that an accommodation would impose an undue hardship.

First, one must determine whether the person alleging discrimination is truly a qualified individual with a disability. An employee is considered to have a disability under the ADA if he/she proves to have a substantial limitation regarding a major life activity. "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. §1630.2(i).

In *Keever v. City of Middletown*, 145 F.3d 809, 812 [8 AD Cases 388] (6th Cir. 1998) the plaintiff was a police officer who suffered on-the-job injuries. The City offered him a desk job at the same pay, but the plaintiff thought it to have less prestige and sued under the ADA. The Court of Appeals affirmed the District Court's findings that the plaintiff was not "otherwise qualified" for the patrol officer position since:

[t]he regulations also provide that if the employee rejects the offered reasonable accommodation "that it necessary to enable the individual to perform the essential functions of the position. . . the individual will not be considered a qualified individual with a disability."

The 6th Circuit ruled similarly in *McKay v. Toyota Motor Manufacturing, USA, Inc.*, 110 F.3d 360 (6th Cir. 1997).

In *Dutcher v. Ingalls Shipbuilding*, 4 AD Cases 802, 805 (5th Cir. 1995) the 5th Circuit reasoned that:

a physical impairment, standing alone is not necessarily a disability as contemplated by the ADA because it does not substantially limit major life activities.

The inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. §1630.2(j)(3)(i).

[2] Thus, the IEBW did not prove that Z— is a qualified individual with

a disability. While Z— clearly has life-long restrictions against climbing and prolonged standing, the grievant did not explain how these restrictions substantially limit his major life activities. He can still eat, breathe, care for himself, etc. His inability to perform all aspects of the CCS job does not preclude him from working. In fact, his testimony indicated that he has been working in a better paying job since March of 1998.

Moreover, the ADA defines "reasonable accommodation" to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position," etc. In the subject case, the Company argued that Z— could no longer perform the essential functions of the CCS job. To prove, for example, that climbing is an essential function of the CCS job, the Company offered a job description. The Union asserted that the job description was drafted just prior to the arbitration, but did not know that some other job description without these essential functions was in force during the relevant time.

[3] The Company explained that it attempted to reassign Z— to another position. "Under the ADA, an employer need only reassign the employee to a vacant position." This is what GTE attempted to do. Conversely, there was no offer of proof that there was some other, more desirable, vacant position that was not offered to Z— at the time. The Union objected to the Employer's offers of reassignment on the basis that such jobs paid considerably less than Z—'s regular job. The Court in *Cassidy* also held that:[9]

An employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available.

In *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 679 [7 AD Cases 1872] (7th Cir. 1998), the 7th Circuit agreed that an employer must identify alternative positions, including *demotions*.

In addition, the grievant in the instant case balked at some of the reassignment offers made by the Company because some were simply offers to interview or to test for a position. The Court in *Dalton* also noted that:[10]

Nothing in the ADA requires an employer to abandon its legitimate nondiscriminatory company policies defining job qualifications, prerequisites and entitlements to intra-company transfers.

Thus, Z— would still have to qualify for a reassignment that accommodated his restrictions.

Finally, it is also up to the Employer to choose the accommodation for the disabled employee. Under the ADA regulations, the Employer has the ultimate discretion to choose between effective accommodations.[11]

[4] The grievant only mentioned one type of accommodation that would meet with his approval, that of creating a special job. This ideal job would include the best of both worlds; it would consist only of pedestal cable work and yet still be classified as a CCS. The courts have recognized that reassignment under the ADA does not require:[12]

creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement.

GTE submitted a job description for the CCS job. A good portion of this job requires the ability to climb in order to install and repair cable. Taking the climbing element out of the job would also warrant a new job analysis and the assignment of commensurate pay. Clearly, the contract does not require this type of accommodation and the ADA does not require the creation of a new job. Thus, although the grievant met the initial burden of proposing an accommodation, he did not show that this proposed accommodation was objectively reasonable.

Company witnesses Sue Banning, Mary Darling and Chris Schultz all testified that the CCS job was designed to be flexible. On any given day some CCSs may be installing aerial cable, while others may be repairing buried cable. CCSs can help each other and finish up jobs for each other because they are not limited to one type of work. At the time of the Arbitration hearing CCSs were working overtime to repair cable that was downed as the result of a storm. Even if there is enough work in general to maintain at least one pedestal CCS worker, the Company is not obligated to create this pedestal job at the expense of keeping other CCSs doing more than their share of aerial work.

Mr. Rice candidly testified that the Union had received some complaints from its membership when CCSs like Z— were assigned to the Line Cut program. Employees naturally resented working outdoors in sometimes harsh conditions, while other employees in their same classification were earning

---

[6] It should also be noted that some arbitrators who state that external law is not their bailiwick nevertheless proceed to discuss external law in their opinions. See *Stone Container Corp.*, 101 LA 943, 947 (Feldman, 1993) and *Herald Corp.*, 110 LA 1121, 1125 (West, 1998).

[7] Bogue, *Melding External Law with the Collective Bargaining Agreement*, ARBITRATION 1997: THE NEXT FIFTY YEARS, Proceedings of the 50th Annual Meeting, National Academy of Arbitrators (J.M Najita ed., 1998) as cited in *Fairweather's Practice and Procedure in Labor Arbitration, supra* at 578.

[8] This arbitral decision is, therefore, more legalistic than is typical for this Arbitrator.

[9] The 6th Circuit also covers Ohio.

[10] *Cassidy, supra* at 634.
[11] *Id.*
[12] *Dalton, supra* at 678.

[13] *Keever, supra* at 812. See 29 C.F.R. §1630.
[14] *Cassidy, supra* at 634.
[15] *Id.*

the same pay and working in air conditioned comfort. Imagine how these CCSs would feel if they were doing more than their fair share of aerial work, while Z⸺ was always doing the desirable pedestal work. Does this not violate other CCSs' rights under the collective bargaining agreement?

The Union and the grievant have not suggested a reasonable accommodation for Z⸺. If Z⸺ is indeed disabled under the ADA definition, turning down the Company's job offers (which were reasonable accommodations at the time) caused the grievant to no longer be considered to be a qualified individual with a disability, and thus he loses protection under the Act.

A few other issues brought up during the course of the hearing merit mentioning. First, the Union was correct in that it was inappropriate for the Company to send letters giving Z⸺ limited options while he was still off work on Workers' Compensation. An employee who is recuperating from such injuries should not be burdened with additional unnecessary worries. This action, however, was not part of the instant grievance, which only protested his termination.

Second, it must be remembered that Z⸺ suffered from a non-work related hip problem (avascular necrosis) before he endured the July 1996 work related injury. By all accounts, Z⸺ had lifelong restrictions even before the July accident occurred. If anything, the July accident probably served to extend Z⸺'s disability payments. This is certainly not to say that the grievant is fortunate to suffer such maladies. Obviously, he would rather be without work restrictions and gladly perform all aspects of his regular CCS job. Life is unpredictable, but one must make the most out of what they are handed.

Despite his work restrictions, it seems that Z⸺ has been productive for another employer. It surprised this Arbitrator to hear that the grievant has been working at his current job since March of 1998, three months before he was officially off the GTE North rolls. One wonders how long Z⸺ would have kept at his dual employment situation, had not someone from GTE sent him the June 12, 1998 letter finally ending his employment there. Even if Z⸺ case warranted his reinstatement to GTE, his higher wage rate at his new job (not to mention overtime) would certainly affect any remedy.

In sum, neither the contract nor the ADA required the Company to do more to attempt to accommodate Z⸺ than it did.

## AWARD

For all of the above reasons, this grievance must be denied. The Company possessed just cause to terminate Z⸺ employment effective June 12, 1998.

Per the Memorandum of Agreement entitled "Payment of Arbitrator" that the parties stipulated was still in force at the time of this arbitration, the Union shall pay all costs of the Arbitrator.

---

## KIMBERLY-CLARK CORP. —

### Decision of Arbitrator

In re KIMBERLY-CLARK CORPORATION, Neenah, Wisconsin **and** PACE INTERNATIONAL UNION, LOCAL 482, December 1, 1999. Arbitrator: Earl J. Wyman

### TRANSFER OF EMPLOYEES

**1. Wage rate ▸120.201**

Employees are not entitled to pay increase to reward them for block of skills they brought with them to plant to which they transferred, even though employee who transferred from facility that paid based on time-and-grade to one that paid based on skills received increase, where grievants transferred from skills based facility to time-and-grade facility.

**2. Wage rate ▸120.201 ▸24.367**

Employees are not entitled to pay increase to reward them for block of skills they brought with them to plant to which they transferred, even though three other similarly-situated employees had been so reclassified, where agreement to reclassify those employees had been deemed non-precedential, and this one situation is not past practice.

**3. Wage rate ▸120.201**

Employees are not entitled to pay increase to reward them for block of skills they brought with them to plant to which they transferred, where they voluntarily transferred to facility that paid employees based on time-and-grade.

---

Appearances: For the employer — Gavin S. Appleby, senior counsel. For the union — Jon T. Geenen, international representative.

## WAGE RATE

### The Issues

WYMAN, Arbitrator: — The parties agree that the questions for which they seek the arbitrator's answers constitute the issues involved in the case:

1. Did the Company violate the applicable labor agreement when it failed to provide pay for the transferable skills of the grievants when they voluntarily transferred from the Badger Globe operation to the Lakeview Distribution Center?

2. If so, what is the appropriate remedy?

### The Facts

In 1991-92, the Company and the Union crafted a time-and-grade pay program for its Lakeview Distribution Center (hereinafter referred to as LVDC). The time-and-grade program is reproduced elsewhere in this Award.

In 1995, to comply with the requirement of the U.S. Department of Justice that as a condition of the Department's approval of the Company's merger with the Scott Paper Company, it divested itself of certain properties. The properties selected by the Company for divestiture were the Badger-Globe facility (hereinafter referred to as BG), and the Lakeview Tissue Mill (hereinafter referred to as LVT). The LVT mill was subsequently purchased by The American Tissue Company; the GB property has not been sold and was closed.

In 1993 five BG employees transferred voluntarily to LVDC at Level 1 of the time-and-grade pay program.

In March, 1993, two additional BG employees—the grievants—voluntarily transferred to LVDC at Level 1 of the time-and-grade pay program.

In 1993-94, five LVT employees transferred to LVDC at Level 1 of the time-and-grade pay program.

Subsequent to their transfers from LVT to LVDC, in a special non-precedent-setting agreement between the Company and the Union, three of the LVT transferees were permitted to transfer their LVT skills to LVDC and upgraded from Level 1 to Level 4 of the time-and-grade pay program.

It is agreed that time-and-grade involves a six step program, from Level 1 (entry) to Level 6. Progression from Level 1 to Level 4 requires the mastery of certain job skills over the passage of time (12 months at Level 2; 6 months at Level 3; and 6 months at Level 4). Movement to Levels 5 and 6 is restricted by imposed quotas: five "slots" in Level 5, 20 "slots" in Level 6. Movement into Levels 5 and 6 require vacancies in the Levels which may occur

as a consequence of retirements, deaths, permanent physical disabilities, terminations, etc. Accordingly, it is possible that Level 5 and 6 positions are occupied by employees less skilled and less senior than those occupied by employees in Levels 1 through 4.

The Company's Neenah, Wisconsin area facilities operate under one or the other pay program (skilled-based, or time-and-grade), not both.

Seventeen months following their voluntary transfers and acceptance of their Level 1 time-and-grade pay assignments (and shortly after the Company and the Union reached their non-precedent-setting agreement to elevate the three LVT employees from Level 1 to Level 4 of the time-and-grade pay program at LVDC), the grievants requested a similar elevation to Level 4 based on skills they brought with them when they transferred from BG to LVDC. Upon the failure of the Company to reach an agreement via the "ISSUE RESOLUTION PROCESS", the grievants' dispute was raised to the status of a formal grievance which read as follows:

"Unfair Labor practice. Pay for skills transferred from Badger-Globe".

Unable to resolve the grievance internally, the matter has been pressed to arbitration.

### The Union's Position

The following points were advanced by the Union in support of its position that the grievance should be sustained:

1. That, the grievants should have been permitted to transfer at least four skill blocks from the Badger-Globe facility to the Lakeview Distribution Center; and,

2. That, any training and mastery periods should have been waived because, within days of commencing their new assignments, the grievants demonstrated their ability to perform the work competently and completely; and,

3. That, both grievants had obtained the highest possible skill level at the Badger-Globe facility and were compensated accordingly; and,

4. That, an examination of the evidence demonstrates that skill blocks are transferable; and,

5. That, there have been a variety of occasions where employees transferred between teams were permitted to maintain their skill blocks and rates of pay; and,

6. That, employee Ontiveros was permitted to carry his full skill blocks when he transferred between teams (the Lakeview Tissue facility to the Badger-Globe facility) even though the basis for pay and the equipment used were not identical; and,

7. That, testimony established the grievants' ability, without assistance and additional training and after only a short orientation, to perform their jobs; and,

knew that discharge may be the discipline invoked for violation of that rule; that the grievant was a rather senior employee with over thirty years of service and that his prior disciplinary record at the facility was not dispositive of the activity involved in the instant matter. Based upon all of the evidence in this case placed there by both sides, it is reasonable to return the grievant to work with some time off by way of a suspension and therefore modify the discharge.

The activity of smoking at this facility may be hazardous. However, the grievant is a senior employee with many years of service. The evidence is quite clear that the company is attempting to maintain an atmosphere free of smoking because of the many hazards involved. However, there must be some common sense attached to this particular termination. Under the facts of this case, the company was apparently arbitrary and capricious in terminating such a senior employee whose prior record was not contributory to his current discharge. Further, in light of the overhead heaters that are operated by pilot and burner, the company can hardly explain one activity in light of the other.

## AWARD

The grievant is returned to work with a thirty day suspension without wage but without loss of seniority. The grievant must mitigate any lost wage for such further period and offer an affidavit of wages earned from other sources in that regard. If the parties cannot agree to the amount of lost wage, the same may be referred to this arbitrator for the determination thereof for which jurisdiction is specially reserved for a period of sixty days from the date hereof.

---

## THERMO KING CORP. —

### Decision of Arbitrator

In re THERMO KING CORPORATION, A Westinghouse Electric Subsidiary [Minneapolis, Minn.] **and** UNITED STEELWORKERS OF AMERICA LOCAL 2175, AAA Case No. 56-300-0004-93, Grievance No. 1992-126-1, July 29, 1993
Arbitrator: Jonathan Dworkin

## DISABILITY

— Arbitrator's authority — Discrimination — Discharge — Just cause ▸94.553 ▸106.01 ▸118.655

Arbitrator has authority to consider whether employer's action in discharging allegedly disabled employee was discriminatory, even though collective bargaining agreement says nothing about rights of handicapped employees, since discharge was governed by just cause, right of handicapped people to hold jobs they can perform was societal value long before Congress made it law, and reasonable accommodation—fundamental employer obligation under Americans with Disabilities Act—has long been recognized as element of just cause by arbitrators; therefore, arbitrator is empowered and obligated to decide if discharge was just and fair, and in making that determination, Americans with Disabilities Act can be looked to for guidance.

— Discharge — Absenteeism ▸118.655 ▸118.6366 ▸106.01 ▸118.653

Employer had just cause to discharge employee for absenteeism because employee that had symptoms of substance abuse, where union's expert was forced to concede that he could not foresee attendance improvement with any degree of certainty, Americans with Disabilities Act does not obligate employer to allow disabled employee to be late or to miss work whenever his depression or its symptomatic alcohol/drug dependency makes it uncomfortable for him to meet his schedule, discharged employee's attendance record was atrocious, and company was forgiving to startling extent.

Appearances: For the employer — Thomas M. Vogt, attorney; Ronald J. Berg, director, human resources; N.A. Shumansky, human resources manager; Neal Tornblom, plant manager; Jeanne O'Neill, supervision manager. For the union — Michael J. Kodluboy, staff representative; Dave Ross, grievance committee chair; Jim Stack, local president; Dick Ireland, witness.

## DISCRIMINATION

### The Issues

DWORKIN, Arbitrator: — [The issues are: — ]

After being restored from discharge under a "last-chance" arrangement, Grievant continued his pattern of attendance violations. Consequently, the Company removed him a second time. Was the second discharge consistent with just cause?

Does the Arbitrator have authority to consider the Union's affirmative argument that Grievant's attendance problems resulted from "major depression" coupled with alcohol and drug dependencies and, therefore, the removal breached his legal protections under the Americans With Disabilities Act?

If the Union's affirmative argument is reviewable by the Arbitrator, is it sufficient to support an award of reinstatement?

### Summary of Dispute

On July 29, 1992, the Company discharged Grievant, a fourteen-year employee. The discipline concluded a long and virtually unbroken record of absences and tardiness. It was the second discharge for Grievant; the first was a year earlier, in July 1991.

Grievant began the 1991 work year by taking a personal day (January 3). He returned the next day, but reported in late. He took two sick days January 7 and 8, was late January 11, absent from scheduled overtime January 12, and late January 14, 16, 21, and 23. The last attendance entry in his record in January 1991 was for the 28th when he neglected to punch in. Beginning February 1, he went on medical leave until mid-July.

Management was aware that Grievant's medical leave embodied many problems, including a jail sentence and hospitalization for drug and alcohol dependencies. But the Company needed more concrete medical documentation to support sickness and accident benefits, and it was the Employee's responsibility to supply it. When Grievant failed to furnish the required medical information by June 28, 1991, the Manager of Human Resources "removed him from the rolls" (terminated his employment). The Union interceded at that point; it supplied the Company with a letter from a drug counselor at Abbot Northwestern Hospital in Brooklyn Center, Minnesota. The letter was dated July 15, two weeks after the discharge. It stated in part:

[Grievant] will successfully complete our program for out-patient chemical dependency on 7/16/91. He transfered [sic] to Brooklyn Center on 7/9/91 for his last week of treatment.

[Grievant] has successfully completed all of his assigned treatment goals. He also has remained sober to the best of my knowledge. [Grievant] will continue coming to Brooklyn Center for his aftercare program; which will meet on Tuesday evenings for a total of twelve weeks. In addition; [Grievant] will be going to AA meetings every week on an ongoing basis.

[Grievant's] diagnosis is poly-drug dependency. His prognosis is good at this time.

The Union was effective in trying to secure leniency for the Employee, because the Company retracted the discharge and granted reinstatement. The grant was conditioned on a letter of last-chance agreement. It provided:

On Tuesday, July 16, 1991, union representatives . . . met with company representatives . . . concerning your removal from the roll at Thermo King. It was explained at that meeting that you had been removed from the roll because the company did not

have up-to-date medical documentation to support your continued absence. After the doctor provided that information, the company reconsidered the action taken and is now willing to reinstate you effective July 19, 1991 with the following covenants:

- Unblemished attendance for the next six months.

- Name, address and contact person who will provide aftercare in view of your substance abuse.

Your reinstatement is conditional upon your commitment to your job in being in attendance and in your having taken care of your personal problems.

You should understand that this last-chance effort being given to you by the company is based on your commitment and you should also understand that, should you falter in that commitment with respect to an unblemished attendance record and/or maintaining your after-care treatment, the company will give you no further consideration and will then remove you from the roll.

Grievant signed the letter, as did his Union Representatives and the Company's Labor Relations Manager. Presumably, he meant to live up to the commitments expressed in the letter and understood that this was to be his last chance to improve. If so, his conduct fell markedly short of his intentions. If anything, his attendance worsened.

There is no need to burden this decision by detailing Grievant's many attendance violations since his reinstatement; it would take several pages to accomplish the task. Suffice it to say that his was possibly the worst record the Arbitrator has seen in twenty-three years of arbitration practice.

The grievance challenging the discharge proceeded to arbitration, and was heard in Bloomington, Minnesota on April 20, 1993. The Union demanded reinstatement with full restoration of wages, benefits, and seniority. Its claim was that the Company did not have just cause for the discipline. Just cause is the contractual principle that governs and restricts Management's disciplinary authority. Section 8 of the Agreement, "Procedures For Discharge Or Suspension," begins with the statement: "Employees may be discharged for just cause."

The Union faced enormous difficulty if it hoped to prevail on the allegation that Grievant's discharge lacked traditional just cause. The evidence established that despite Grievant's fourteen years of service to the Company, his attendance violations were beyond intolerable. And Management was more than lenient. It was extraordinarily patient and forgiving of the Employee's excessive absences and tardiness. Supervision counseled him repeatedly, applied progressive discipline, did everything reasonable to help him improve. But the Employee

was resistant to all efforts. He continued to indulge his addictions to alcohol and cocaine; he continued to miss work.

It must have been obvious to the Union that ordinary just-cause arguments would be futile. But there was one aspect of Grievant's medical history that merited attention. The Employee's inpatient and outpatient treatments for addictions had generated a volume of medical records. The Union investigated them and discovered that Grievant suffered chronic depression dating back to early adolescence. According to some medical-psychological diagnoses, his dependencies on cocaine and alcohol were secondary symptoms of major-depression episodes. In other words, a disabling illness—depression—was the primary cause for both alcohol/drug abuse and attendance failures.

The Union then turned to the Americans With Disabilities Act (hereafter referred to alternately as "ADA" or "the Act"). Congress passed it in 1992 to prohibit discrimination against handicapped people, especially in employment. Section 12112 of the Act prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, *or discharge of employees,* employee compensation, job training, and other terms, conditions, and privileges of employment." According to §11211, a "qualified individual with a disability" covered by ADA is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Section 12102 defines "disability" broadly:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

In the Union's judgment, ADA applied to Grievant's chronic depression. That meant the Company could not fire him without first attempting to make reasonable accommodation for his disability.

The Company responded that ADA compliance was not a contractual issue and, therefore, outside the Arbitrator's jurisdiction. Furthermore, according to the Company, even if the Act applies to this dispute, it does not protect Grievant. Section 12114, Subsection (a) excludes persons "currently engaging in the illegal use of drugs" from the definition of "a qualified individual with a disability," and Subsection (c)(4) states that an employer does not have to make reasonable accommodation for alcohol impairment. Grievant's discharge, in the Company's view, resulted from both alcoholism and drug abuse.

## Arbitral Jurisdiction of the ADA Issue; Preliminary Findings and Conclusions

The Company argued for rejecting the Union's invitation to decide whether Grievant's discharge violated the Act. It introduced a volume of decisions by courts and arbitrators holding that an arbitrator's jurisdiction extends only to resolving contractual questions; issues of law are reserved to the courts and quasi-judicial agencies such as the Equal Employment Opportunity Commission. The decisions encompass a range of discrimination complaints concerning acts prohibited by law. The leading decision cited in the Company's brief, *County of Orange,* 76 LA 1040 (1981) explained Arbitrator Philip Tamoush's refusal to deal with sexual-preference discrimination under a labor contract that did not specifically prohibit the act:

While in most cases, even in dealing with these same parties, this arbitrator has viewed issues of arbitrability on a generally broad and liberal basis, as urged by most laws and court decisions dealing with the issue, he has done this based on sufficient ambiguity of the parties' intent or agreement to permit the exercise of such arbitral discretion. However, where the facts are clear and the precedents well set out, the Arbitrator sees no need to add to the parties' agreement something wholly unintended. . . . he should not engage in "legislative innovation" when the parties have so clearly provided a specific listing of prohibited discrimination in protected groups not merely for illustration, but to provide specific limits.[1]

The Company points out that this dispute and the contractual language governing it closely parallel the example. As in *County of Orange,* the Thermo King-Steelworkers Agreement contains an exclusive Nondiscrimination Clause. Section 1, Subsection 1.04 prohibits discriminating because of Union membership or activity, race, creed, color, sex, age, and national origin. It says nothing about the rights of handicapped employees. Moreover, Subsection 1.04 is the *complete* understanding between the parties on the subject of discrimination. It must be read in conjunction with Section 10, Subsection 10.11. Subsection 10.11 is a kind of "zipper clause," clarifying that the employment rights set forth in the Agreement are all that exist. It states:

The provisions of this Agreement constitute the sole rights and obligations and the sole procedure for the processing of settlement of any claim by an employee or the Union of a violation by the company of this agreement.

In the Company's view, therefore, "disability discrimination does not violate a term or provision of the collective bargaining agreement." [2] It follows that a decision on ADA would be "legislative innovation," beyond the powers of this Arbitrator.

The Arbitrator does not disagree with *County of Orange* decision. It is a sensible, prudent affirmation of the precept that arbitrators must base their awards on the labor-management contracts that create and confine their authority. They cannot ignore, embellish, or recast negotiated language even to improve it. The U.S. Supreme Court adopted this principle thirty-three years ago in three decisions commonly known as "The Steelworkers Trilogy." In one of the Trilogy decisions, the Court held:

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.[3]

The rationale in *County of Orange* would be a compelling basis for disregarding the Union's ADA arguments here if the two cases were alike. But they are not. There is a profound difference between them. This is a discharge dispute governed by just cause; *County of Orange* was a job-access controversy where just cause was not in question.

When contract negotiators restrict an employer's disciplinary authority with the single term, "just cause," they open each discipline grievance to arbitral intrusion. They license arbitrators to do precisely what the Supreme Court sought to restrain—fashion decisions based on individual ideas of industrial justice. While the words "just cause" may seem straightforward and simple, they are not. They embody a profusion of concepts and ideals about what is a just penalty.

It is well settled that discipline is not just if it is manifestly unfair. But how does one decide what is "fair" and "unfair?" Where does one look for guidelines and principles? One source is arbitral "precedent"—the maxims set forth in nearly a half-century of published decisions on the subject. While

the decisions are not carved in granite, they have been followed so long and so regularly as to create a presumption that negotiators intend to keep on following them when they agree that employees can be discharged only for just cause.

Another obvious resource for deciding what does or does not form just cause is basic societal values. The right of handicapped people to hold jobs they can perform was a societal value long before Congress made it a law. Arbitrators expressed it decades before ADA was enacted. Reasonable accommodation, the fundamental employer obligation under the Act, has long been recognized as an element of just cause by arbitrators. If anything, arbitrators have been more permissive than ADA.

The Arbitrator agrees that technically, he cannot decide whether Thermo King violated the Act when it discharged Grievant. That is a question for the courts. But he is empowered and obligated to decide if Grievant's penalty was just and fair. In making that determination, it is appropriate to look to the Act for guidance. Accordingly, it is held that the Union's ADA-based arguments are germane to this dispute. The Company's motion to dismiss them is denied.

## Discussion and Opinion

Alcohol and cocaine were two of the factors responsible for Grievant's failure to meet his work schedule. The Union's ADA contentions could not secure the Employee's reinstatement if his addictions were his disabilities. As stated, the Act does not require employers to make reasonable accommodations for alcoholics and users of illegal drugs, and the Union did not claim otherwise. Its case rested on the assertion that chronic depression, not substance abuse, caused Grievant's attendance violations. The Employee's apparent inability to report for work regularly and on time, according to the Union, was symptomatic of his depression; cocaine and alcohol abuse was another symptom:

The grievant . . . had been a long-term employee of Thermo King Corporation. He was hired on March 13, 1978 and was officially discharged in July of 1992. There is no question that he had a severe attendance and tardiness situation compounded by the use at times of alcohol and other drugs. However, the point must be made that these actions and the use of alcohol and other drugs is symptomatic of a person under major depression and not its cause. The grievant was suffering from major mental depression, a fact verified during the hearing by the Union's first expert witness, Mr. Richard Ireland of the Ramsey County

---

[1] Quoted from Company brief, 16.

[2] Company brief, 15.

[3] *United Steelworkers of America vs. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597 [46 LRRM 2423] (1960).

Medical Center's Department of Psychiatry. He clearly stated that "major depression is a disability. It is an Axis I issue" as defined under a rating system used by the American Psychiatric Association.

* * *

While it is true that [Grievant] had accrued a questionable attendance record, it was nonetheless beyond his control. If he could have changed or prevented these problems, it would have been done. He was physically unable to change and his personal home experiences only served to make matters worse. This type of traumatic experience alone can place anyone into a depressed state of mind. However, [Grievant] had the state of mind since adolescence. This is a most important fact because it was this major depression that caused the unacceptable behavior and not the other way around. [Grievant] did abuse alcohol because of his depression. [Grievant] did use other drugs because of his depression. [Grievant] was on drugs for his therapy for his depression. [Grievant's] behavior throughout was because of his depression. [Grievant] definitely has and is suffering from major mental depression. He has a disability.[1]

Presumably, major depression is a disability covered by the Act. The Union maintains that all Grievant's attendance difficulties flowed from this disability which has been a lifelong problem for him. During the year and one-half covered by his terrible attendance record, his depression allegedly was exacerbated by two disastrous marriages, seemingly inextricable debts, and the continual reminders that he might lose his job. The Union urges that the Company had a duty to accommodate for his disability, not fire him for it.

As indicated, Grievant received and is receiving psychiatric treatment from the Ramsey County Medical Center. The Union furnished records of that treatment and expert testimony from the Center to confirm its position. The expert witness was a drug and alcohol counselor who worked under supervision of a staff psychiatrist. Based on the medical records and his own observations of Grievant, he testified that while the hospital admission initially was for drug and alcohol addictions, "[t]he underlying cause is dysthymia, which is a long-term depressive neurosis."[2]

The counselor carefully listed the symptoms and indications of Grievant's depression. The list included diminished interest, insomnia, difficulty getting to sleep, waking up in the middle of the night, fatigue, feelings of worthlessness, guilt, and hopelessness, suicidal tendencies, and substance abuse. Without qualification, his pro-

fessional opinion was that Grievant's chemical dependencies are symptoms, not causes of his underlying depression.

The Arbitrator found the Union's presentation impressive. Its brief noted that this dispute is a "new ground maker or precedent setter, utilizing for one of the very few times, the Americans with Disabilities Act (ADA)."[1] Actually, this was an overstatement. A decision reinstating Grievant and requiring the Company to make accommodation for him would not be ground-breaking precedent. It would be consistent with arbitral decisions predating the Act by forty to fifty years. It is not novel for an arbitrator to order an employer to accommodate for a disability if an accommodation reasonably can be made. The difficulty with adopting the Union's position is not its novelty; it is whether the accommodation is a reasonable one.

A pivotal question put to the Union's expert was whether the Employee's depression, or at least his inability to report for work regularly could be cured. The counselor thought that a gain might be realized if Grievant were assigned to a later shift, but was forced to concede that he could not foresee attendance improvement with any degree of certainty. The concession emerged clearly on cross examination:

Q. Now, in Union Exhibit 3 it indicates that he was discharged on August 24th of 1992, is that right?
A. Yes.
Q. And in your report you made a prognosis regarding his future?
A. Right.
Q. And your prognosis was "guarded"?
A. Right.
Q. In other words, by guarded you would agree that would mean there is a good likelihood that the same behavior problems that he exhibited in the past would occur in the future?
A. There is a possibility, yes. Behavior is not predictable.
Q. And I think in your prognosis you said that to the extent there are negative relationship issues it's going to increase the likelihood that his problems would continue?
A. That would be one of the contributing factors, sure.

There are limits to what the Act and elemental fairness require. The Union is seeking, in effect, an award licensing Grievant to be late or miss work whenever his depression or its symptomatic alcohol/drug dependency makes it uncomfortable for him to meet his schedule. Nothing in the Act imposes that kind of obligation on employers. Under §12111, an employer

might have to adapt for a disability by creating part-time or modified work schedules, but it does not have to accept an employee's chronic, unexcused absenteeism and tardiness. Similarly, arbitrators have held routinely that allowances for disabilities, they do not have to retain employees who will not or, through no fault of theirs, cannot keep to work schedules.

A remarkable aspect of this dispute is that after his discharge from Thermo King, Grievant secured another job and has maintained perfect attendance there. It is a hopeful sign. But it came too late for an award directing the Company to reinstate him. His year-and-one-half record at Thermo King was atrocious. The Company was forgiving to a startling extent. It gave him more second chances than just cause required. It could have applied the last-chance agreement and discharged Grievant a year earlier, but elected not to. Instead, it reverted to job counseling and progressive discipline.

In the year following his last reinstatement, Grievant received job discussions, warning slips, and progressive suspensions. In the two months before his final discharge, he was late thirteen times—mostly because he overslept—and absent three times. His excuse for one of the absences was that he had to make a court appearance. That turned out to be a lie.

If there was ever a case where a Company followed the principles of just cause before discharging an employee, this is it. Under these facts, the Union's disability argument cannot defeat the cause or justice for Grievant's removal. The grievance will be denied.

**AWARD**

The grievance is denied.

---

**CAMPBELL COUNTY —**

**Decision of Arbitrator**

In re CAMPBELL COUNTY BOARD OF EDUCATION [Tenn.] **and** CAMPBELL COUNTY FEDERATION OF TEACHERS LOCAL 3847, AAA Case No. 39-390-0061-91, March 1, 1994

Arbitrator: Jerry A. Fullmer

**EMPLOYEE BENEFITS**

**— Coverage of plans — Dental insurance ▸100.5915 ▸100.5925**

County board of education did not violate collective-bargaining contract that stipulated that dental insurance coverage was to be restored by board for all professional employees "subject to proper funding by the County Commission," even though board's final budget worksheet did not include dental insurance and county commissioners do not have line item veto, where board's midnight funding for coverage in its original budget worksheet sent to commission, and there is no evidence of board's bad faith in process that led to final budget approval by commissioners.

---

Appearances: For the employer — Joseph G. Coker, county attorney; Arlis Chapman, superintendent; Jeff Marlow, financial administrator; Jim Finley, director. For the union — G. Bruce Shine and Don Mason, attorneys; Gwen Accawi, president; Curt Chitwood, secretary-treasurer.

**Coverage**

FULLMER, Arbitrator: — This case[1] concerns dental insurance coverage for the 1991–1992 academic year.

**I. Facts[2]**

*A. Background Facts:* The Employer operates the public school system in Campbell County, Tennessee. The Union represents a unit of the certificated personnel in the system. The framework of the parties' collective bargaining is not in controversy and has been described in a prior arbitration opinion in a case between the same parties:

"Collective bargaining between unions representing teachers and school boards was established in 1978 when the State of

[1] Campbell County Board of Education (hereafter referred to as 'the Employer') and Campbell County Federation of Teachers, Local No. 3847, American Federation of Teachers, AFL-CIO (hereafter referred to as "the Union"), are parties to a collective bargaining agreement dated September 6, 1989. The agreement provides in Article IV for settlement of disputes through a grievance and arbitration procedure. A dispute has arisen between the parties concerning dental insurance coverage for the 1991–1992 academic year.
[2] The Union's grievance concerning this matter was undated. It was submitted to arbitration before this arbitrator under the administration of the American Arbitration Association. A hearing was held on February 15, 1994 at the Campbell County Courthouse in Jacksboro, Tennessee. Both advocates made opening and closing statements and presented and cross-examined witnesses. The Union was willing to stipulate that the grievance was both procedurally and substantively arbitrable; that the time limits in the grievance procedure had either been met or waived and that the arbitrator has been properly chosen and has jurisdiction to hear the case. The Employer was unwilling to so stipulate.

[1] Union brief, 2, 4–5.
[2] Transcript, 64.

[1] Union brief, 3.
[2] Transcript, 75.