IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 614, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PECO ENERGY COMPANY, <br><br> Defendant. | CIVIL ACTION <br> NO. 23-4388 |

**OPINION**

**Slomsky, J.**                                                                                                                                         **July 22, 2024**

**I.     INTRODUCTION**

This matter arises from an employer's demand for the private therapy notes of its employees as a condition of employment.  On November 9, 2023, Plaintiffs International Brotherhood of Electrical Workers Local 614m AFL-CIO ("Local 614"), Damien Duckery ("Duckery"), John Koniewicz ("Koniewicz"), and Joshua Kulchinski ("Kulchinski") (collectively "Plaintiffs") initiated this action against Defendant PECO Energy Company ("Defendant" or "PECO").[1]  (Doc. No. 1.)  On the same day, Plaintiffs filed a Motion for a Preliminary Injunction.  (Doc. No. 2.)  In their Complaint and Motion, Plaintiffs seek a preliminary injunction to enjoin Defendant from demanding Plaintiffs' confidential medical records or therapy notes, to reinstate Plaintiffs to full employment, and to consolidate and expedite their individual grievances.  For reasons that follow, Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 2) will be denied.

---

[1] Plaintiffs' Complaint consists of one count for a preliminary injunction ("Count One").  (See Doc. No. 1 at 23.)

1

## II.  BACKGROUND

Plaintiff Local 614 is an unincorporated labor organization under the Labor Management Relations Act ("LMRA").  (Doc. No. 1 at 3.)  Plaintiffs Duckery, Koniewicz, and Kulchinski are individual members of Local 614 and employees of Defendant.  (Id. at 5.)  Defendant is a private utility company that provides gas and electric energy to customers in Pennsylvania.  (Doc. No. 2-1 at 2.)  Plaintiff Local 614 and Defendant are parties to a Collective Bargaining Agreement ("CBA") which establishes the terms and conditions of labor for employees engaged in electrical and gas distribution and maintenance work.  (Doc. No. 2-1 at 2-3.)

For many PECO employees, a condition of employment includes being able to drive company vehicles.  (Id. at 3.)  To drive certain company vehicles, employees must obtain and maintain a Commercial Driver's License ("CDL").  (Id. at 3.)  To obtain a CDL, employees are required to procure a valid Medical Examiner's Certificate ("ME Certificate"), which must be periodically renewed.  (Id.)  An individual seeking a CDL in Pennsylvania can obtain an ME Certificate from any qualified medical examiner in the Commonwealth.  (Id.)  However, PECO only accepts ME Certificates that are issued by its own Occupational Health Services Department ("OHS").  PECO's OHS is responsible for conducting medical evaluations of PECO employees and certifying that they are medically cleared to work.  (Id. at 2.)

If a PECO employee whose job requires a valid CDL is unable to obtain an ME Certificate, they are placed on modified work duty or light duty status.  (Id. at 3.)  This change would make an employee ineligible for most overtime opportunities.  (Id.)  Further, an employee with less that fifteen (15) years of service who remains on a modified or light duty status for more than six (6) months due to a failure to obtain an ME Certificate must find a position that does not require a CDL or be terminated.  (Id.)

2

Similarly, a medical evaluation is required for any PECO employee who is attempting to return from short-term disability leave or from participation in PECO's Employee Assistance Program. (Id. at 3-4.) If an employee with less that fifteen (15) years of service is not cleared to return to work, they will have six (6) months to demonstrate fitness for duty or to find a vacant position for which they are qualified. (Id. at 4.) If they are unable to do so, they are subject to termination. (Id.)

Plaintiffs Duckery, Koniewicz, and Kulchinski are currently on modified duty or on leave. (Id.) Plaintiffs Duckery and Kulchinski are on modified duty because OHS has not renewed their ME Certificates. (Id.) Plaintiff Koniewicz is on leave because OHS has not approved him to return to duty following short-term disability leave. (Id.) Plaintiffs are on modified duty because the OHS Manager, Barbra Guenst ("Guenst"), is demanding that they submit complete mental health records, including the notes from their private therapy sessions. (Id.) The circumstances surrounding each individual Plaintiffs' work status are described below.

A.  **Plaintiff Damien Duckery**

Plaintiff Damien Duckery has been employed by PECO since September 2013. (Id. at 5.) He is classified as a 1st Class Line Mechanic at PECO's Distribution System Operation Department. (Id.) His position requires him to hold and maintain a CDL. (Id.) In November 2022, Duckery requested a leave of absence and short-term disability leave to deal with "stress he was experiencing in his personal life." (Id. at 6.) He sought treatment through PECO's Employee Assistance Program and began meeting with a therapist, Dr. Huan Tang Lu. (Id.) At the conclusion of Duckery's treatment, Dr. Lu sent a report to OHS recommending that Duckery return to full-duty employment. (Id.) Upon receiving Dr. Lu's report, OHS informed Duckery that he needed

3

to attend additional counseling for substance abuse.² (Id.)  At OHS's insistence, Duckery complied. (Id.) He began seeing a Counselor, Greg Pryor. (Id.)

In April 2023, Duckery returned to work at PECO. (Id.) Shortly thereafter, he attempted to renew his ME Certificate for his CDL. (Id.) At that point, OHS instructed him to participate in a program for alcohol abuse. (Id.) Guenst placed Duckery on modified duty pending the completion of this program. (Id.) Duckery was permitted to perform "all the other safety-sensitive duties of his job" but "was not allowed to drive a PECO vehicle, or to accept call outs for overtime." (Id.)

In May 2023, Duckery obtained an ME Certificate through a medical examiner independent of OHS. (Id. at 7.) Nevertheless, OHS continued to refuse to issue Duckery an ME Certificate unless OHS received "verification that [his] serious health condition [was] controlled." (Id.) He was notified that OHS would need a copy of his therapy notes to "confirm engagement with ongoing treatment." (Id.) Duckery's Counselor, Greg Pryor, who he began seeing after OHS instructed him to attend counseling for substance abuse, insisted he would not release any therapy notes but that he would be willing to prepare a summary report of Duckery's progress. (Id. at 7-8.) OHS reiterated that it would not issue an ME Certificate without the notes from a treating therapist. (Id. at 8.) As a result, Duckery remains on modified duty.

---

² Plaintiffs maintain that "[t]he rationale of this recommendation remains unclear; the reason for Duckery's leave was entirely unrelated to alcohol or drug use, he had never failed a drug or alcohol test, nor been accused of possessing, using or being impaired by any prohibited substance while working, and Dr. Lu did not indicate in his report that Duckery had any problem with substance use." (Doc. No. 2-1 at 6.)

B.     **Plaintiff John Koniewicz**

Plaintiff John Koniewicz has been employed by PECO since April 17, 2017.  (Id. at 9.)  He is classified as a Substation Operator-Maintenance Technician 1st Class in the Transmission and Substation Department.  (Id.)  He is not required to hold a CDL to perform his job duties.  (Id.)

In June 2023, Koniewicz voluntarily entered Brookdale Premier Addiction Recovery Center to begin a thirty-one (31) day treatment program for alcohol use.  (Id.)  While there, Koniewicz received counseling from a therapist, Fred Collier.  (Id.)  On July 28, 2023, Koniewicz completed the treatment program.  (Id.)  At that point, a doctor cleared Koniewicz to return to work without restrictions.  (Id.)  When Koniewicz contacted OHS, he was informed that he had to be assessed by an Employee Assistance Program provider.  (Id.)  Upon evaluation, Koniewicz was recommended to undergo an intensive outpatient program for four (4) weeks before he could return to work.  (Id. at 10.)

On August 10, 2023, Koniewicz entered an intensive outpatient program at Recovery Centers of America and attended therapy sessions with a Licensed Clinical Social Worker, Dana Marouchoc.  (Id.)  Marouchoc assured Koniewicz that anything shared with her would remain strictly confidential.  (Id.)

On September 20, 2023, Koniewicz was cleared by a Substance Abuse Professional and Licensed Clinical Social Worker to return to work without restrictions.  (Id.)  However, Guenst insisted that in order for Koniewicz to return to work, he would need to provide medical and therapy notes for OHS review.  (Id.)  Marouchoc wrote to Guenst recommending that Koniewicz return to work and stated that she would not provide Guenst with the therapy notes due to confidentiality concerns.  (Id.)  Nevertheless, Guenst maintained that OHS would not allow Koniewicz to return to work without a copy of these records.  (Id.)  To date, Koniewicz has been

5

unable to return to work and Guenst has threatened to "discontinue his [short-term disability] benefits." (Id. at 11.)

## C. Plaintiff Joshua Kulchinski

Plaintiff Joshua Kulchinski has been employed by PECO since September 12, 2022. (Id. at 11.) He is classified as a Line School Apprentice Aerial Line Mechanic in the Construction and Maintenance Department. (Id.) His position requires him to hold and maintain a CDL. (Id.)

In August 2022, Kulchinski underwent an OHS medical evaluation and disclosed that he was on anti-depressant medication. (Id.) OHS informed Kulchinski that his primary care doctor, Dr. Dave Lewis, would need to complete a form with details regarding his medication and his ability to drive while on duty. (Id. at 11-12.) Dr. Lewis completed the documentation and OHS issued Kulchinski an ME Certificate. (Id. at 12.)

One year later, Kulchinski began the process of renewing his CDL certification. (Id.) He documented his use of the same anti-depressant medication and Dr. Lewis completed the same form detailing Kulchinski's medication. (Id.) However, Kulchinski failed to report an anti-anxiety medication that Dr. Lewis prescribed, which created a discrepancy between his disclosure and the form Dr. Lewis' submitted. Because of the discrepancy, Guenst demanded the personal therapy notes of Dr. Lewis before she would approve Kulchinski's re-certification. (Id.) Despite his reservations, Kulchinski provided Guenst with his private therapy notes. (Id.)

After reviewing the notes, Guenst determined that Kulchinski would need to be assessed for substance abuse issues and ordered him to be evaluated.[3] (Id.) Guenst then placed Kulchinski on modified duty. (Id.) As instructed, Kulchinski attended a consultation with a Substance Abuse

---

[3] Like Plaintiff Duckery, Plaintiff Kulchinski was "shocked at this development" because he had not expressed issues with alcohol use to Dr. Lewis. (Doc. No. 2-1 at 12.)

Professional, Vincent Rodgers.  Rodgers determined that Kulchinski did not have a substance abuse issue.  (Id. at 12-13.)  Despite this determination, Kulchinski was directed to attend sessions with a Licensed Clinical Social Worker, Merle Mullins.  (Id. at 13.)  Mullins assured Kulchinski that any disclosures made during their sessions were private and protected.  (Id.)  While Kulchinski was continuing his sessions with Mullins, Guenst demanded a copy of Mullins' notes.  (Id.)  Mullins expressed serious discomfort and apprehension with Guenst's demands and offered instead to provide OHS with a tailored executive summary of their sessions.  (Id.)  To date, Kulchinski remains on modified duty.  (Id.)

### D. Plaintiffs' Grievances

On October 26, 2023, Plaintiff Local 614 filed grievances on behalf of Plaintiffs Duckery, Koniewicz, and Kulchinski.  (Id. at 14.)  They argue that OHS's actions violate Article 3.5 of the Collective Bargaining Agreement, which prohibits discrimination on the basis of a disability.  (Id.)  Plaintiffs requested that the grievances be consolidated, expedited, and given priority.  (Id.)  PECO has refused to agree to these requests.  (Id.)

### E. Plaintiffs' Motion for a Preliminary Injunction

On November 9, 2023, Plaintiffs initiated this case.  (See Doc. No. 1.)  On the same day, Plaintiffs filed a Motion for a Preliminary Injunction.  (Doc. No. 2.)  In the Motion, Plaintiffs request that the Court enter a preliminary injunction against Defendant, requiring Defendant to:

> (1) cease demanding confidential medical records from its employees as a condition of employment; (2) immediately reinstate Damien Duckrey, John Koniewicz, and Joshua Kulchinski to full employment, pending the arbitration of the underlying disputes in their cases, and (3) agree to consolidate the Grievances filed on October 26, 2023 on behalf of the individual Local 614 member Plaintiffs and process the Grievances on an expedited basis.

(Doc. No. 2 at 1.)  On December 1, 2023, Defendant filed a Response in Opposition.  (Doc. No. 9.)  On the same day, Plaintiffs filed a Reply.  (Doc. No. 7.)  On January 4, 2024, the Court held a hearing on the Motion.  Plaintiffs' Motion for a Preliminary Injunction is now ripe for disposition.

### III.  STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy."  Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).  Therefore, preliminary injunctive relief "should be granted only in limited circumstances."  Id. (citation omitted).  To obtain a preliminary injunction, the moving party must show as a prerequisite:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting Del. River Port Auth. v. Transamerican Trailer Transp., Inc., 501 F.2d 917, 919-20 (3d Cir. 1974)).  A party moving for a preliminary injunction must initially "meet the threshold for the first two…factors," and only if these "gateway factors" are met should the district court then consider the remaining two factors.  Id. at 178.  The court must then determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  Id. at 179.

### IV.  ANALYSIS

Plaintiffs seek a preliminary injunction that orders Defendant to (1) cease demanding confidential medical records, (2) immediately reinstate Plaintiffs Duckery, Koniewicz, and Kulchinski to full employment pending the arbitration of their grievances, and (3) agree to consolidate the grievances filed by Plaintiffs on an expedited basis.  (See Doc. No. 2.)  Defendant opposes Plaintiffs' Motion for a Preliminary Injunction, arguing that a preliminary injunction in

this case would "run afoul of the Norris-LaGuardia Act's prohibition on injunctive relief, except under extreme circumstances." (Doc. No. 9 at 7.)

In general, federal courts have jurisdiction to hear labor disputes involving private employers. See 29 U.S.C. § 185. That jurisdiction, however, is limited by provisions of the Norris-LaGuardia Act ("NLA"), 29 U.S.C. § 101. The NLA prohibits federal courts to issue injunctions in cases involving labor disputes:

> No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101. "This is because the overriding purpose of labor law is to allow the parties, to the extent possible, to settle their own disputes in accordance with their contractual agreements." Commc'ns Workers of Am., AFL-CIO v. Verizon Commc'ns, Inc., 255 F. Supp. 2d 479, 48 (E.D. Pa. 2003) (internal citations omitted).

Nevertheless, in Boys Market, Inc. v. Retail Clerk's Union Local 770, the United States Supreme Court created a narrow exception that allows courts to grant an injunction when it is "necessary to force the parties to comply with a mandatory arbitration clause in the collective bargaining agreement." Id.; see also Boys Markets, Inc. v. Retail Clerks Union Local 770, 398 U.S. 235 (1970). In determining whether a Boys Market injunction may issue, the Court must apply a three-part test:

> (1) whether the underlying dispute is subject to mandatory arbitration; (2) whether the employer, rather than seeking arbitration of the grievance, is interfering with and frustrating the arbitral processes which the parties had chosen; and (3) whether an injunction would be appropriate applying traditional principles of equity.

Commc'ns Workers of Am., AFL-CIO v. Verizon Commc'ns, Inc., 255 F. Supp. 2d at 484. As stated above, the traditional requirements for injunctive relief are: (1) probability of success, (2)

irreparable injury, (3) the possibility of harm to other interested persons, and (4) the public interest. Reilly v. City of Harrisburg, 858 F.3d at 176.

For reasons that follow, Plaintiffs have failed to meet the requirements for a Boys Market injunction. Therefore, the anti-injunction provision of 29 U.S.C. § 101 is in effect here. Accordingly, the Court will deny Plaintiffs' Motion for a Preliminary Injunction.

### A. Plaintiffs' Dispute May be Arbitrable

First, the Court must determine whether Plaintiffs' dispute with PECO is subject to the arbitration provisions in the Collective Bargaining Agreement ("CBA"). Pursuant to the CBA, only disputes that arise under the CBA are covered by the grievance procedure. The CBA defines a "grievance" as "a dispute between [PECO] and the Union or its members as to the interpretation, application of or compliance with the provisions of th[e] [Collective Bargaining] Agreement." (Doc. No. 1-1 at 29.) The grievance procedure outlined in the CBA follows four steps: (1) a notice to immediate supervisor, (2) a grievance to a labor relations representative, (3) a written appeal to a department manager, and finally (4) arbitration. (See id. at 30-31.)

Plaintiffs argue that the dispute is arbitrable under the grievance procedure of the CBA. (Doc. No. 2-1 at 15.) The CBA provides that:

> Any dispute arising out of, or otherwise relating to, any provision of this Agreement is subject to the parties' interim grievance procedure culminating in final and binding arbitration.

(Doc. No. 1-1 at 43.) Defendant disagrees and argues that the grievances at issue here are not subject to arbitration because the claims are not covered by the CBA. (Doc. No. 9 at 22.)

In support of their argument, Plaintiffs cite to Article 3.5 of the CBA, which provides:

> [PECO] and the Union agree that the operation or application of the provisions of this [Collective Bargaining] Agreement shall in no way serve to discriminate against any individual with respect to compensation, terms, and conditions of employment or otherwise affect his status as an employee because of such individual's race, color, creed, sex, age, handicap, national origin, or status as a

10

   disabled or Vietnam Era Veteran. Furthermore, there shall be no discrimination, interference, restraint, or coercion by [PECO] or any of its agents against any employee because of his membership in the Union or because of any lawful activities on behalf of the Union; and the Union, its members, and its agents, shall not unlawfully coerce employees into membership in the Union and shall not solicit membership in the Union while employees are working.

(Doc. No. 1-1 at 7.) PECO, on the other hand, argues that Article 3.5 of the CBA "does not subject all claims of discrimination against [PECO] to the CBA's grievance procedure" because the CBA covers "[o]nly discrimination claims that involve 'the operation or application of the provisions of the Agreement.'" (Doc. No. 9 at 22.) In sum, Defendant argues that Plaintiffs are unable to cite to a CBA provision that covers the dispute at issue. (Id.)

  In labor disputes, when a contract contains an arbitration clause, "there is a presumption of arbitrability." United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co., 522 F.3d 324, 331 (3d Cir. 2008). Such a presumption is particularly applicable where the clause is broad. See AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986). Further, "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" and any "[d]oubts should be resolved in favor of coverage." Id. (citing Lukens Steel Co. v. United Steelworkers, 989 F.2d 668, 672–73 (3d Cir. 1993)). Here, the CBA includes a broad arbitration clause that covers "any dispute" and defines a grievance as a dispute as to the "interpretation, application, of or compliance with the provisions of [the CBA]." (Doc. No. 2-1 at 15.) Therefore, it cannot "be said with positive assurance that the arbitration clause is not susceptible [to] an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582-83 (1960). Thus, Plaintiffs satisfy the first condition for injunctive relief: that the instant dispute is arbitrable.

### B. Defendant Has Not Frustrated the Arbitral Process

As previously noted, the second step of the Boys Market test requires a court to determine "whether the employer, rather than seeking arbitration of the grievance, is interfering with and frustrating the arbitral processes which the parties had chosen." Commc'ns Workers of Am., AFL-CIO v. Verizon Commc'ns, Inc., 255 F. Supp. 2d at 484.

Here, Plaintiffs do not explicitly argue that PECO is interfering with or frustrating the arbitral process. However, Plaintiffs allege that PECO refuses to expedite or consolidate the individual Plaintiffs' grievances. (Doc. No. 2-1 at 5, 14, and 27.) In their Complaint, Plaintiffs allege:

> 100. On or about October 26, 2023, Local 614 filed Grievances on behalf of Damien Duckrey, John Koniewicz, and Joshua Kulchinski, alleging that PECO is violating Article 3.5 of the CBA, by allowing its OHS to engage in practices that discriminate against Union members on the basis of "perceived" disability, and by forcing them, as a condition of regular employment and/or eligibility for [short-term disability], to surrender their right of privacy in the personal therapeutic notes maintained by their health care providers. (Anastasi Aff., at ¶¶ 26-27).
>
> 101. Because of certain structural roadblocks in the Grievance and Arbitration Procedure, however, unless the Company agrees to allow these cases to proceed on a consolidated basis, and to be heard on an expedited basis, it is likely that they will not be decided by a neutral arbitrator until at least late 2024, or even early 2025. (Id., at ¶¶ 29-39).
>
> 102. On or about November 7, 2023, Local 614 Business Manager Lawerence J. Anastasi met with representatives of the Company to discuss the problems the Union has with OHS generally, and in the course of this discussion the Individual Local 614 Member Plaintiffs' Grievances were also addressed. (Anastasi Aff., at ¶ 40).
>
> 103. Anastasi asked the PECO representatives if they would agree to move the Grievances to the "head of the list" of cases to be scheduled and heard, and agree to hear those cases in a consolidated fashion and on an expedited basis. (Anastasi Aff., at ¶ 41).
>
> 104. The PECO representatives refused to provide Anastasi with any assurance that it would treat the Grievances in any way other than what the CBA normally provides. (Id.)

(Doc. No. 1 at 22-23.) To the extent Plaintiffs argue that PECO's refusal to consolidate or expedite their grievances is evidence that Defendant is interfering with or frustrating the arbitral process, that argument is unavailing. PECO's refusal to consolidate or expedite the grievances is not evidence that they are interfering with the arbitral process. Instead, Plaintiffs' own allegations suggest that PECO is complying with their standard arbitration procedures. Plaintiffs' qualm is that the standard arbitration procedure would mean that their grievances would not be resolved until "at least late 2024, or even early 2025." (Id. at 22.) This, however, does not show that Defendant is interfering with or frustrating the arbitral process. In fact, it confirms that Defendant is proceeding pursuant to its typical arbitration procedures. Therefore, the Court cannot find that PECO is interfering with or frustrating the arbitral process.

### C. Plaintiffs Have Failed to Meet the Traditional Principles of Equity

The third and final step of the Boys Market test requires Plaintiffs to prove the traditional requirements for injunctive relief, which are: (1) probability of success on the merits, (2) irreparable injury, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. See Reilly v. City of Harrisburg, 858 F.3d at 176. As explained above, "[a] party moving for a preliminary injunction must initially "meet the threshold for the first two . . . factors," and only if these "gateway factors" are met should the district court then consider the remaining two factors." Id. at 178.

#### 1. Probability of Success on the Merits

The first traditional prerequisite to obtaining a preliminary injunction is that Plaintiffs must demonstrate a probability of success on the merits. "Demonstrating a probability of success on the merits is not an onerous burden in the context of a Boys Markets injunction." Commc'ns Workers of Am., AFL-CIO v. Verizon Commc'ns, Inc., 255 F. Supp. 2d 479, 485 (E.D. Pa. 2003).

13

The Third Circuit Court of Appeals has held that "in the context of a Boys Markets injunction, the union need only show that the position it takes is sufficiently sound to prevent the arbitration from being a futile endeavor." See IUE-CWA v. Flowserve Corp. of Pennsylvania, 239 F. Supp. 2d 527, 532 (M.D. Pa. 2003) (quoting Nursing Home & Hospital Union No. 434 AFL–CIO–LDIU v. Sky Vue Terrace, Inc., 759 F.2d 1094, 1098 n. 3 (3d Cir. 1985)).

Here, Plaintiffs demonstrate that their position is sufficiently sound to prevent arbitration from being a futile endeavor. Plaintiffs argue that OHS's instance on reviewing the private therapy notes of Plaintiffs Duckery, Koniewicz, and Kulchinski violate the anti-discrimination provision of the Collective Bargaining Agreement. The CBA prohibits PECO from taking any adverse action against any union employee on the basis of an individual's handicap. Plaintiffs argue that PECO discriminated against them in violation of the CBA due to their "perceived" handicaps. (Doc. No. 2-1 at 16.) While the Court is not making a finding regarding the merit of this argument, Plaintiffs have demonstrated a sufficiently sound position that meets the low burden required to show probability of success on the merits in the context of a Boys Markets injunction.

### 2.     Irreparable Injury

Next, Plaintiffs must show irreparable harm. Here, the relevant inquiry for a court is "whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Textron Lycoming Reciprocating Engine Div., Avco Corp., 919 F. Supp. 783, 789 (M.D. Pa. 1996) (citing SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985)). "In order to constitute irreparable harm, an injury must be so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party" and an arbitrator's award

"would render the award an empty victory." Communications Workers of America, ALF-CIO, 255 F. Supp. 2d at 485.

Here, Plaintiffs allege that the irreparable injury they face is reputational harm. (Doc. No. 2-1 at 24.) In particular, Plaintiffs argue that they "face stigmatization, embarrassment, and imminent harm to their reputations and privacy" and that "[b]y the time [their] grievances are heard and decided by an arbitrator, their injuries will have already come to pass." (Id. at 26.) In support of this argument, they cite to Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO, Loc. 2-286 v. Amoco Oil Co. (Salt Lake City Refinery) for the proposition that "the invasion of privacy associated with drug testing, and resulting humiliation and damage to reputation, constitute irreparable injury." 885 F.2d 697, 707 (10th Cir. 1989).

Plaintiffs' allegations do not show irreparable injury. Although "harm to [an individual's] reputation may be a basis for irreparable harm, [a plaintiff] still bears the burden of demonstrating that irreparable harm is likely." See Cornette v. Graver, 473 F. Supp. 3d 437, 476 (W.D. Pa. 2020) (citing Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 195 (3d Cir. 1990)). Here, Plaintiffs have not carried that burden.

In their Motion for a Preliminary Injunction, Plaintiffs generally assert that they face "stigmatization, embarrassment, and imminent harm to their reputations." (Doc. No. 2-1 at 26.) They argue that "[o]nce their privacy has been breached and the intimate details of their therapeutic treatment revealed, no conceivable arbitral award could begin to truly make them whole." (Id.) While the notes of a therapist undoubtedly contain personal details, Plaintiffs have not shown that providing Guenst with this material would cause the details of their treatment to be revealed in a public manner. In fact, PECO's OHS "policies surrounding DOT medical certifications are designed to protect confidentiality of medical information." (Doc. No. 9 at 27.)

15

Therefore, Plaintiffs' contention that their intimate medical details would be revealed is speculative. "[T]he risk of irreparable harm must not be speculative." Adams v. Freedom Forge Corp., 204 F.3d 475, 488 (3d Cir. 2000). "Rather, an assertion of irreparable harm must be based on concrete evidence and cannot be sustained 'on the basis of "bald and conclusory" statements.'" Robson Forensic, Inc. v. Shinsky, No. 5:22-CV-1309, 2022 WL 1198228, *2 (E.D. Pa. 2022) (quoting Cornette v. Graver, 473 F.Supp.3d 437 (W.D. Pa. 2020)). For this reason, Plaintiffs have failed to demonstrate irreparable injury.

A "failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982). Here, Plaintiffs failed to demonstrate irreparable injury. As stated above, a party moving for a preliminary injunction must initially meet the first two threshold factors and only if the first two factors are met should the district court then consider the remaining two factors. Although Plaintiffs met the first factor (likelihood of success on the merits), they failed to meet the second factor (irreparable injury) and therefore the Court need not address the remaining factors. Based on the foregoing, Plaintiffs' Motion for a Preliminary Injunction will be denied.

V.     CONCLUSION

Although Plaintiffs' dispute may be arbitrable, they have not met the requirements for the Court to issue a Boys Market injunction because Defendant has not frustrated the arbitral process, and Plaintiffs did not adequately plead irreparable harm. As a result, the anti-injunction provision of 29 U.S.C. § 101 applies here. Therefore, Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 2) will be denied. An appropriate Order follows.